[No. 65205-8.  En Banc.]
Argued January 28, 1998.     Decided May 21, 1998.
*In the Matter of the Dependency of* A.E.P., ET AL.
MICHAEL PETCU, *Petitioner*, THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent*.

TALMADGE and GUY, JJ., dissent by separate opinion.

*Preble Law Firm*, by *Gary A. Preble*, for petitioner.

*Christine O. Gregoire, Attorney General*, and *Edward J. Dee, Assistant*, for respondent.

*Gene M. Grantham* on behalf of Washington Association of Criminal Defense Lawyers, amicus curiae.

*Norm Maleng, Prosecuting Attorney for King County*, and *James M. Whisman, Deputy*, on behalf of Washington Association of Prosecuting Attorneys, amicus curiae.

DOLLIVER, J. — In the course of a dependency hearing concerning the welfare of five- and three-year-old sisters, Judge Toni A. Sheldon allowed A.E.P., the five year old, to testify concerning allegations of sexual abuse by her father, Michael Petcu. The judge also admitted into evidence numerous hearsay statements made by A.E.P. to seven different individuals. Michael Petcu (Petitioner) claims A.E.P. was incompetent to testify, and he claims her hearsay statements were inadmissible under RCW 9A.44.120.

Our summary of the facts has been derived from the trial court's findings of fact and from the testimony of the numerous witnesses. The record contains nearly 1500 pages

of transcripts of testimony given during the dependency hearing. Since the second issue involves the reliability and admissibility of A.E.P.'s hearsay statements, the content of those statements and the circumstances surrounding the making of those statements will be explained in detail.

Petitioner and Elizabeth (Liz) Petcu are the biological parents of A.E.P., born on November 22, 1987, and W.M.P., born on February 6, 1990. The parents are divorced, and Petitioner had custody of the girls. Petitioner and the girls resided in Mason County at the time the dependency petition was filed in 1993.

Prior to fall 1992, Petitioner had paid Alice Eccelston and her husband Tom Nelson to provide child care for A.E.P. and W.M.P. Eccelston testified they had provided child care for approximately one and one-half years. She normally bathed the girls every other day, and she never observed any sexualized behavior between the girls in the bathtub.

From October or November 1992 until the filing of the dependency petition in April 1993, Deanne Montgomery and her husband Dan provided child care to A.E.P. and W.M.P. Deanne and Dan have four children of their own. A.E.P. and W.M.P. would usually spend ten hours a day, five days a week, at the Montgomery house; but on occasion the girls would stay six or seven days a week, and on some days they would stay for longer hours as well.

Deanne testified she observed many instances of inappropriate sexualized touching between A.E.P. and W.M.P. in the course of her providing child care. During bathing, A.E.P. would allegedly try to wash W.M.P.'s vaginal area. One time in a bath, A.E.P. allegedly attempted to insert a little sailor toy into W.M.P.'s vagina. Deanne discussed these matters with her husband, and he supposedly would relay the information to Petitioner when Petitioner arrived in the evenings to pick up his daughters. Petitioner testified the Montgomerys never informed him of any problems with A.E.P. and W.M.P. prior to April 1993.

In late March or early April 1993, Deanne caught her

seven-year-old son, C.M., under a blanket with A.E.P. A.E.P.'s pants and underpants were down and C.M. was tickling A.E.P. in the vaginal area. Petitioner introduced testimony from two other children who rode the same school bus as C.M., and both of those children testified C.M. would inappropriately touch and fondle other kids on the bus. The trial court's fact findings make no mention of these allegations about C.M.'s apparent pattern of behavior.

On April 13, 1993, Deanne and her friend, Shawn Murphy, caught A.E.P. and W.M.P. lying on the floor in a bedroom. W.M.P. was on her back with her pants pulled down, A.E.P.'s hand was on W.M.P.'s vaginal area, and W.M.P. was screaming and fighting to get away. Deanne and Shawn separated the girls and punished A.E.P. by making her stand in a corner for a period of time. After Deanne called Petitioner at his place of work, she and Shawn questioned A.E.P. for somewhere between 45-to-90 minutes trying to discover where A.E.P. had learned such behavior. At the beginning of the interview, A.E.P. was upset, was crying, and did not want to discuss the matter. Deanne and Shawn comforted A.E.P., told her she could trust them, and calmed her down.

In the course of the interview, A.E.P. said her father had touched her inappropriately, skin to skin, and the touching was not during baths. A.E.P. also said her mother had touched her, and her mother knew about her father touching her. When Deanne's husband Dan came home after work, he took A.E.P. into the kitchen and also questioned her for close to an hour. A.E.P. again stated her father had touched her inappropriately.

A.E.P.'s disclosures to Deanne, and to Dan, were in response to completely closed, leading questions. Deanne Montgomery, herself a victim of sexual abuse as a child, had questioned A.E.P. 12-to-15 times on prior occasions whether anyone had touched her, and on several of those occasions Deanne had asked A.E.P. if her father had touched her. Both Montgomerys admitted they had no training in interviewing techniques.

On the same day as these interviews, Deanne called Child Protective Services (CPS) and reported the alleged abuse. Kyle Smith, a CPS worker, received the report the next day, on April 14, 1993. Kyle spoke with Deanne on the 14th, and both girls were taken into protective custody by law enforcement. The details surrounding A.E.P.'s being taken into custody are relevant to the circumstances of A.E.P.'s hearsay statements to Kyle.

According to Kyle's testimony, she and Sheriff Deputy O'Brien picked up A.E.P. from the Blackwell home around 5:30 P.M. Someone at the Blackwell residence was apparently baby-sitting A.E.P. When Kyle took A.E.P. from the residence, A.E.P. was crying. In the car, Kyle held A.E.P. in her lap to comfort her. The deputy stopped at a substation to use the restroom, and Kyle took A.E.P. inside the substation. Kyle began chatting with A.E.P. about where and with whom she lived. Kyle then saw Petitioner drive up to the front of the substation, so Kyle took A.E.P. to the back of the station, where they sat on the stairs and continued talking. A.E.P. had also seen her dad pull up, and she was distracted because she wanted to see him, but Kyle would not let A.E.P. speak with her father. In the back of the substation, Kyle discussed with A.E.P. whether A.E.P. knew the difference between truth and lies. Kyle then started talking about good touches and bad touches, but she stopped questioning A.E.P. because Kyle did not have any interviewing tools with her. Kyle also realized "that that was the place not to do the interview sitting on the stairs." Narrative Report of Proceedings at 122 (Kyle Smith).

After Petitioner left the substation, Kyle took A.E.P. and drove to Kyle's office. It was approximately 8:30 P.M. when they arrived at the office. Kyle took A.E.P. to McDonald's, which was within walking distance. Kyle bought A.E.P. a "Happy Meal," and they took their food back to the office. While still eating, Kyle showed A.E.P. a body map and began to discuss it with A.E.P. In the interview, A.E.P. stated she had been inappropriately touched by C.M. (age 7) and K.B. (age 4). After A.E.P. had disclosed the touching by C.M. and

K.B., Kyle asked if any bigger person or adult had touched her, and A.E.P. got tears in her eyes and said she was not supposed to talk about it. A.E.P. explained her dad told her she should not talk about it and would get put in a corner or spanked.

In response to Kyle's questioning, A.E.P. stated "her father touched her privates with his hand in his bedroom; that her father made her touch his bare buttocks; that her father tried to make her touch him in addition to touching his bare buttocks and she pulled her hand away; that while her father was touching her, he was wiggling his penis; and that her father stuck his tongue in her mouth and on her leg." Clerk's Papers at 38-39. The specific details given to Kyle included bits of information such as it did not hurt when her dad touched her privates; it occurred in the nighttime; and it occurred on the floor of dad's bedroom. When asked where W.M.P. was during this alleged touching, A.E.P. said W.M.P. was sleeping in dad's bed.

On cross-examination, Kyle admitted the CPS intake sheet indicated "that Mom had touched both [A.E.P.] and [W.M.P.] in their privates." Narrative Report of Proceedings at 177 (Kyle Smith). The information on the intake sheet assumedly came from Deanne Montgomery's call to the CPS. Despite this information, Kyle never asked A.E.P. about seeing her mother touch W.M.P. Kyle asked A.E.P. one time whether her mother had touched her, and after A.E.P. said no, Kyle stopped pursuing that line of questioning.

The day of April 14, 1993, A.E.P. and W.M.P. were placed with Judy Brewer, a foster mother. Judy received W.M.P. in the early afternoon, but she did not get A.E.P. until around 9:30 P.M., after A.E.P. had been interviewed by Kyle Smith. A.E.P. was tired when Judy picked her up. Judy had the girls for nearly six weeks, but she never observed any sexual acting out between the girls during baths. Judy also never observed any sexualized touching when the girls were left in a room to play together.

Two days after receiving the girls, Judy took them to Dr.

Victor Cillis for an examination. One month later, Dr. Cillis conducted a second examination. After this second visit, A.E.P. was very upset in the car on the way home. She was upset about being touched by the doctor during a pelvic exam. Judy told A.E.P. it was okay for a doctor to touch her, and A.E.P. then spontaneously stated she had something to tell Judy. A.E.P. then disclosed she had been touched by C.M., and he had done it a few times. Judy then asked if anyone else had touched her, and A.E.P. said no. On a different occasion, A.E.P. again had told Judy in the course of conversation that A.E.P.'s father had not touched her.

Judy observed two other occasions of spontaneous statements made by A.E.P. which were suspicious. One time when A.E.P. was playing with a balloon, she looked at the nipple and said it looked like a penis to her. Another time, A.E.P. had said "sitting on Dad's lap made her privates real red and hurt." Narrative Report of Proceedings at 5 (Judy Brewer). Neither statement was in response to questions, nor did Judy follow those statements with other questions.

As previously mentioned, both girls were taken to Dr. Victor Cillis for two medical exams. The first exam occurred on April 16, 1993. Dr. Cillis spoke with W.M.P., but obtained no information helpful in determining whether she had been sexually abused. The exam of W.M.P. showed an abnormally large hymeneal diameter and notching of her hymen, but there was no evidence of penile penetration. The doctor's findings with regard to W.M.P. were consistent with digital fondling and penetration. W.M.P.'s second exam, on June 23, 1993, was consistent with the initial findings.

On April 16, 1993, Dr. Cillis interviewed A.E.P. for approximately one-half hour. During the interview, Dr. Cillis asked A.E.P. if anyone had touched her in the vaginal area, and she did not reveal anything about anyone touching her. On cross-examination, the doctor stated A.E.P. had indicated during the first interview that her father had *not* touched her. The doctor asked A.E.P. if she had touched

anyone else, and after initially denying it, A.E.P. later responded she had touched her sister in the vaginal area. The doctor's first exam of A.E.P. seemed to be within normal limits, but there was mild nonspecific redness of her vaginal area.

At A.E.P.'s second visit with Dr. Cillis on June 23, 1993, the doctor again interviewed A.E.P. for one-half hour. During this interview, A.E.P. indicated she had been touched in her vaginal area by a boy named C.M. She said C.M. always wants to put his hands in her pants. When asked if anyone else had touched her, she failed to respond. Later in the interview, the doctor asked if A.E.P. had ever seen male genitals. She said she had seen her father's, and the doctor elicited details. She stated in a matter-of-fact way, in response to segmented questioning, that she had seen her father in his room wiggling his privates by the heater. He was watching television, did not say anything, and was not near A.E.P. He did not touch A.E.P., nor did he ask her or W.M.P. to touch him. A.E.P. stated she was sitting on a yellow stool watching television while her dad was wiggling his privates.

Dr. Cillis' second exam of A.E.P. disclosed a slight notch in her hymen, but he was not sure of its significance, and was only mildly concerned. Other signs of trauma were not present, but the doctor admitted a child can be fondled without being physically traumatized. On cross-examination, Dr. Cillis answered it was very possible that A.E.P.'s sexual behavior exhibited towards her sister could have been learned from C.M.'s sexual behavior towards A.E.P.

Detective Brian Kelly was assigned to the Petcu case on April 15, 1993. On April 22, 1993, Detective Kelly interviewed A.E.P. Kyle Smith was present during this interview. At the beginning of the interview, Detective Kelly asked A.E.P. how she felt about her father. She responded she liked him, but sometimes he did bad things. When asked to elaborate, she said sometimes he will not let her go outside. When asked if her dad was bad in any other way, she said no. Detective Kelly then started discussing

good touches and bad touches. At this point, A.E.P. seemed to withdraw and not want to talk about it. The detective asked several open-ended questions of whether anyone had touched her, and she consistently responded no. When the detective started asking more specific questions, A.E.P. said a friend named C.M. had touched her privates. Detective Kelly then asked if her father had touched her in that way, and she said no.

According to Kyle, who was present at this interview, when A.E.P. was first asked if her father had touched her where she did not like, she did not say anything, but pointed to the buttocks on a drawing. According to the detective's testimony, he asked another follow-up question regarding her father touching her privates, and she gave a negative response. The detective then told A.E.P. it was very important for her to tell the truth, and again asked if she had been touched, and she said no again. At this point, Kyle Smith interrupted and reminded A.E.P. of what Kyle and A.E.P. had discussed in their previous interview. After this, A.E.P. began telling Detective Kelly that her father had touched her.

When the detective asked A.E.P. what she was wearing during the touching incident, A.E.P. stated she had been wearing purple pants and a plain red colored shirt. A.E.P. said her father poked her with his index finger, and when asked whether he touched her inside or outside, she responded inside. When asked if the touching was all the way in or just a little, she said all the way. According to Kyle, A.E.P. told the detective that it hurt when her father poked her in her privates. The detective asked A.E.P. about her father wiggling his privates, and she volunteered that he stood up to do it, and it was big and hard, although she did not touch it. According to Kyle, the detective also asked A.E.P. if anything came out of her dad's privates when he was wiggling it, and she said no. She said pee comes out of it when he goes to the bathroom. The transcript of the detective's testimony fails to reveal any further details about the alleged touching or wiggling incident. It is

unclear from the detective's testimony whether the touching and wiggling related by A.E.P. supposedly happened at the same time, or whether they were separate incidents.

Several times throughout the interview, the detective asked A.E.P. whether the events she reported were real or not. On cross-examination, the detective admitted he never got a "clear handle" on whether A.E.P. understood the difference between truth and lies, but he said she appeared to know the difference between what really does versus does not happen.

Petitioner hired a licensed psychologist, Dr. Stuart A. Greenberg, to interview the girls and Petitioner. Dr. Greenberg also interviewed Liz Petcu. Dr. Greenberg spent one hour with just W.M.P. and A.E.P. on July 12, 1993, and he then spent one hour with the girls and their mother on the same day. On July 21, 1993, Dr. Greenberg spent one hour with Kyle Smith and the girls, and then spent one-half hour with Petitioner and the girls.

Dr. Greenberg testified about some of his concerns which arose in his first interview of the girls:

> Uh, well in terms of their behavior, some things that they said to me are worth noting. For example: Um, [A.E.P.] made a big deal about complaining about Kyle, I want to be clear that I am not endorsing this, I'm telling you what she told me. Uh, that Kyle was trying to get her to say something that she didn't want to say and she was emphatic about how I don't remember it, I didn't say it and my dad never touched me, uh, it was almost too emphatic. . . .

Narrative Report of Proceedings at 14-15 (Stuart Greenberg). A.E.P. also told Dr. Greenberg, " 'My daddy did not touch me, I tried to explain to Kyle but she was working all day.' " Narrative Report of Proceedings at 15 (Stuart Greenberg).

During Dr. Greenberg's second interview with A.E.P., Kyle was also present. The doctor testified that his notes relate the following:

> [A.E.P.] kept looking at Kyle while denying that anyone except

[C.M.] had touched her vagina. Uh, that was after telling me uh, contradictory things, she told me at one time that she had told Kyle that her father had touched her vagina but that she was wrong about that. Another time she had told me that her father had never touched her vagina, it was only [C.M.]. Then she told Kyle to her face that her father had never touched her vagina. We are hearing these very different stories from this girl from within, you know, a matter of an hour. Uh, when I had asked her, she was very consistent that the only person who uh, touched her body in an inappropriate way was [C.M.]. Uh, Kyle then tried to remind [A.E.P.] of what [A.E.P.] had told her before, and [A.E.P.] got upset and looked Kyle in the eye and asserted loudly "I'm telling the truth." That is not what she told me, that is not what she had said five minutes before, but that is what she claimed at the moment.

Narrative Report of Proceedings at 25-26 (Stuart Greenberg).

Petitioner's attorney questioned Dr. Greenberg in depth about proper versus improper interviewing techniques. Dr. Greenberg stated over 80 percent of the studies showed children from three-to-five years old are at the height of suggestibility. He testified the first interview of a child concerning sexual abuse is the most important, because

[i]t's at that point the child's memory is most susceptible to influence. You got a child who is, memory traces at that point are pure, if you will; and that first interview is the opportunity to either cement that child's memory and fix it at what really happened or to influence it or alter it. So the first interview, particularly if it is substantial, is critical to what the report the child gives later.

Narrative Report of Proceedings at 38 (Stuart Greenberg).

Besides all the hearsay statements A.E.P. made to all the individuals above, A.E.P. also testified at the dependency hearing. A.E.P. was first questioned by the judge to determine her competency. While A.E.P. could not explain the difference between the truth and lies, she could identify a lie when the judge asked factual questions such as, "If I told you that this robe that I have on is bright yellow, would

that be the truth or lie[?]'' Narrative Report of Proceedings at 4 (A.E.P.). The judge asked only three simple factual questions about truth or lies, and then allowed counsel to further question A.E.P. about her memory of past events. After further questioning, the judge administered a formal oath to A.E.P. When asked if she promised to tell the truth, A.E.P. said ''Yeah.'' Narrative Report of Proceedings at 15 (A.E.P.).

The court then questioned A.E.P. as to the details of the touching. To briefly sum up A.E.P.'s testimony, she testified she had been touched by C.M.; she related one incident where she claimed her father had touched her ''pee-pee'' after tucking her into bed, Narrative Report of Proceedings at 34 (A.E.P.); and she related a separate incident where she saw her father wiggling his penis in his bedroom, but there was no interaction between herself and her father during the wiggling incident. As reflected by the transcript of A.E.P.'s testimony, the trial court never attempted to ascertain *when* these events had supposedly occurred.

After taking the testimony of all the witnesses, the trial court issued a ruling entitled ''Findings as to Hearsay Statements under RCW 9A.44.120.'' This document analyzes the *Ryan* (*State v. Ryan*, 103 Wn.2d 165, 691 P.2d 197 (1984)) factors of reliability. The court allowed every hearsay statement made by A.E.P. regarding any alleged sexual contact into the proceedings. The court also found A.E.P. was competent to testify, and it allowed her testimony. The judge found that, based on a preponderance of the evidence, A.E.P. ''is abused as defined in Chapter 26.44 RCW by her father . . . .'' Clerk's Papers at 42. The court found the children were dependent.

After finding dependency, the trial judge ordered Petitioner to be evaluated for sexual deviancy. Petitioner was evaluated by at least two different individuals. He took two polygraph tests, one plethysmograph test, and completed other evaluations. His results were allegedly consistent with nonoffenders. After these favorable reports were returned to the court, the court then ordered Petitioner to

"successfully participate in and complete treatment for sexual deviancy with a state certified therapist." Dependency Review Hearing Order at 5.

The dependency proceedings were later dismissed, because Liz Petcu had subsequently modified the divorce arrangement to regain custody of the girls. Judge Sheldon also presided over the motion to modify the custody arrangement. Judge Sheldon essentially incorporated her dependency finding of sexual abuse into the parenting plan, granted custody to Mrs. Petcu because of the finding of abuse, and allowed Petitioner limited supervised visitations with the girls.

Even though the dependency proceedings have been formally dismissed, Petitioner seeks to have the dependency findings overturned because those findings have been incorporated into the parenting plan. He also desires to have the order for sexual deviancy therapy overturned, even though the order is no longer in effect because the dependency proceedings were dismissed.

The Court of Appeals Commissioner decided the dependency issue was not moot because the dependency findings are still being relied upon by the divorce court with regard to the custody disposition and parenting plan. After finding the controversy ripe for review, the Commissioner granted a RAP 18.14 motion on the merits to affirm the dependency court's findings. The Court of Appeals declined to modify the Commissioner's ruling, and we granted review. *In re Dependency of A.E.P. & W.M.P.*, 133 Wn.2d 1002, 943 P.2d 662 (1997).

First Issue: Was A.E.P. competent to testify?

As an initial matter, we note Petitioner claims A.E.P. was rendered incompetent to testify because her memory was tainted by improper interviewing techniques. At oral argument Petitioner's counsel conceded his challenge of memory taint more strongly focuses on the admissibility of A.E.P.'s hearsay statements, rather than on her competency to testify. Therefore, we address the "taint" question under the second issue, regarding the admissibility of A.E.P.'s hearsay statements.

By statute, persons "who appear incapable of receiving just impressions of the facts, respecting which they are examined, or of relating them truly[,]" are not competent to testify. RCW 5.60.050(2). Five factors must be found before a child can be declared competent:

> The true test of the competency of a young child as a witness consists of the following: (1) an understanding of the obligation to speak the truth on the witness stand; (2) the mental capacity at the time of the occurrence concerning which he is to testify, to receive an accurate impression of it; (3) a memory sufficient to retain an independent recollection of the occurrence; (4) the capacity to express in words his memory of the occurrence; and (5) the capacity to understand simple questions about it.

*State v. Allen*, 70 Wn.2d 690, 692, 424 P.2d 1021 (1967). Appellate courts give great deference to a trial court's determination of a child's competency or lack thereof—the trial judge's findings "will not be disturbed on appeal in the absence of proof of a manifest abuse of discretion." *State v. Swan*, 114 Wn.2d 613, 645, 790 P.2d 610 (1990) (quoting *Allen*, 70 Wn.2d at 692).

The trial judge did not issue a written ruling on A.E.P.'s competency under the *Allen* factors, nor is such written ruling required. Short of imposing such a requirement, we still encourage trial courts in future cases to enter written findings regarding competency, because written findings enable appellate courts to better consider and rule on a party's attack against the competency of a child witness.

Petitioner claims A.E.P. did not meet the first two *Allen* factors. Finding the second *Allen* factor dispositive of the issue, we do not address the first factor here. To be competent to testify, A.E.P. must have had the mental capacity *at the time of the alleged abuse* to receive an accurate impression of it. Having reviewed the entire record, we find nothing establishing the date or time period of the alleged sexual abuse. None of the hearsay statements made by A.E.P. indicate *when* the alleged touching by her father happened. The record contains no indication of A.E.P. ever

being asked by any of her interviewers to state, even in the most general of time periods, when the events happened. In fact, it appears from the record that A.E.P. was asked just one time when the alleged events happened—this occurred during the cross-examination of A.E.P.

Petitioner's counsel asked A.E.P. about the incident where she was caught with C.M. touching her, and counsel asked why she had not told then that her father had also touched her. A.E.P. responded:

A   Uh, he [presumably her father] hadn't touched me since a long time when he [presumably C.M.] was touching me.

Q   I see.

A   And – and it hurted so I haven't told him that for a long time.

Q   I see. So the time that he touched you was a long time ago?

A   Yeah, very long.

Q   Very long? Was it when your momma lived there at the house?

A   No, when my momma – when my momma lived in Portland.

Q   I see, who was your baby sitter then?

A   Uh, Grandma Alice and Lori and Shelby and DeAnn.

Narrative Report of Proceedings at 87 (A.E.P.). This is the only indication in the record of A.E.P. ever discussing *when* the alleged touching occurred. Her ability to pinpoint the event clearly failed, because she named four different baby-sitters. Alice baby-sat for approximately 18 months, Deanne then baby-sat for approximately another 6 months, and it is unknown when Lori or Shelby baby-sat. A.E.P. was unable to fix any particular point in time when the alleged touching occurred. Her confused answer raises questions *about her capacity at the time of the alleged event.* The alleged touching incident could have happened soon before A.E.P.'s disclosure to Deanne, but it could have occurred

two or more years prior to the disclosure as well—there is simply no information in the record which helps narrow the time window of when the event occurred.

If the trial court has no idea when the alleged event occurred, the trial court cannot begin to determine whether the child had the mental ability at the time of the alleged event to receive an accurate impression of it. In *State v. Pham*, 75 Wn. App. 626, 630, 879 P.2d 321 (1994), the court found a young child could "recollect details about an automobile accident in Canada which occurred a short time before the incident with Mr. Pham." *State v. Przybylski* held a child must be able to demonstrate, at least, the ability "to receive just impressions of and accurately relate events *which occurred at least contemporaneously with the incidents at issue . . . ." State v. Przybylski*, 48 Wn. App. 661, 665, 739 P.2d 1203 (1987) (emphasis added). If the child can relate contemporaneous events, the court can infer the child is competent to testify about the abuse incidents as well. *Id*.

The court cannot possibly rule on a child's "mental capacity at the time of the occurrence . . ., to receive an accurate impression of it[,]" when the court has never determined when in the past the alleged events occurred. *Allen*, 70 Wn.2d at 692. At oral argument, counsel for the State conceded the trial judge, at the time of the competency hearing, had not been told by anybody when the events were supposed to have occurred. The sole fact that A.E.P. supplied particular details about the alleged touching when questioned by the court does not in itself guarantee A.E.P.'s ability to accurately recall the events. Without any concrete reference, there is no way to guarantee the child's recall of details is based on fact, as opposed to fantasy. *See Przybylski*, 48 Wn. App. at 665 (Witness' memory and perception are "better tested against objective facts known to the court, rather than disputed facts and events in the case itself.").

As in *Pham* and *Przybylski*, the court should have determined whether the child has the capacity *at the time*

*of the event* to receive an accurate impression of the event. This would have required the trial court to fix a time period of the alleged abuse. Absent this critical information, and despite the high level of deference accorded to the trial court's competency findings, we are compelled to hold the trial court abused its discretion in finding A.E.P. competent to testify. The second *Allen* factor was not met in this case. We reverse the trial court's finding A.E.P. competent to testify.

Second Issue: Were A.E.P.'s hearsay statements properly admitted under RCW 9A.44.120?

Normally, a child's prior hearsay statements regarding alleged abuse are inadmissible in court unless they meet one of the established exceptions such as "excited utterance," *State v. Owens*, 128 Wn.2d 908, 912, 913 P.2d 366 (1996) (holding the victim's particular statements did not qualify for this hearsay exception), or a statement made for purposes of medical diagnosis. *In re Dependency of S.S.*, 61 Wn. App. 488, 499-504, 814 P.2d 204 (1991). The Legislature added a new hearsay exception when it enacted RCW 9A.44.120. Under this statute, if a child witness testifies at a criminal trial or a dependency hearing, the child's out-of-court statements concerning abuse are admissible if the court finds "the time, content, and circumstances of the statement provide sufficient indicia of reliability[.]" RCW 9A.44.120(1). If the child is unavailable to testify at trial, additional corroboration of the hearsay statements is also required before the hearsay will be allowed. RCW 9A.44.120(2)(b).

Since the trial court allowed A.E.P.'s testimony at trial, the court did not address the question of whether A.E.P.'s hearsay statements were corroborated by other evidence under RCW 9A.44.120(2)(b). Instead, the court only determined A.E.P.'s hearsay statements were reliable under RCW 9A.44.120(1) and *State v. Ryan*, 103 Wn.2d 165, 691 P.2d 197 (1984) (setting out nine factors to be considered when determining the reliability of a child's out-of-court declarations). Since the trial court erred in allowing A.E.P.

to testify, we must reevaluate the application of RCW 9A.44.120 to A.E.P.'s hearsay statements. Being incompetent to testify, A.E.P. should have been found unavailable as a witness. Being unavailable as a witness, A.E.P.'s hearsay statements not only must be reliable, but they must be corroborated by other evidence of abuse. RCW 9A.44.120(2)(b).

On the issue of the reliability of a child's hearsay statements, Petitioner claims the existing state of the law inadequately addresses the possibility of a child's statements having been tainted by improper, suggestive interview techniques. Citing *State v. Michaels*, 264 N.J. Super. 579, 625 A.2d 489 (Ct. App. Div. 1993) (*Michaels* I), *aff'd*, 136 N.J. 299, 642 A.2d 1372 (1994) (*Michaels* II), and *Idaho v. Wright*, 497 U.S. 805, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990), Petitioner claims the trial court should have held a separate, pretrial "taint" hearing to determine if A.E.P.'s hearsay statements, and her in-court testimony, were so tainted by improper interview techniques that her hearsay statements and testimony were rendered unreliable, thus inadmissible. *Michaels* II held when alleged child sexual abuse victims were improperly interrogated, causing a substantial likelihood the evidence derived from those children was unreliable, it was proper to require a trial court to hold a pretrial taint hearing at which the state must prove by clear and convincing evidence that statements and testimony retained sufficient indicia of reliability. *Michaels* II, 642 A.2d at 1383.

Petitioner claims A.E.P. was improperly interviewed, resulting in taint, and rendering her statements unreliable. His arguments heavily rely on *Michaels* I, *Michaels* II, and *Idaho v. Wright*, all of which discuss various improper interview techniques. *Michaels* II, citing AMERICAN PROSECUTORS RESEARCH INSTITUTE, NATIONAL CENTER FOR PROSECUTION OF CHILD ABUSE, *Investigation and Prosecution of Child Abuse* (1987), states an interviewer should remain open, neutral, and objective; should avoid asking leading questions; should never threaten a child or try to force a reluctant child to

talk; and should refrain from telling a child what others have reported. *Michaels* II, 642 A.2d at 1378. *Michaels* II also cites the New Jersey Governor's Task Force on Child Abuse & Neglect, *Child Abuse and Neglect: A Professional's Guide to Identification, Reporting, Investigation and Treatment* (1988) for the rule that multiple interviews with various interviewers should be avoided. *Michaels* II, 642 A.2d at 1378. *Idaho v. Wright* affirmed the Idaho Supreme Court's holding that a child's hearsay statements were unreliable because "blatantly leading questions were used in the interrogation . . .[, and] this interrogation was performed by someone with a preconceived idea of what the child should be disclosing." *Wright*, 497 U.S. at 813 (internal quotation marks omitted).

Petitioner claims the circumstances of A.E.P.'s interrogation by Deanne Montgomery seriously undermine the reliability of A.E.P.'s statements, and he claims the taint infected A.E.P.'s subsequent disclosures to other people as well. First, Petitioner points out that Deanne, admittedly untrained in proper interviewing procedure, was herself a victim of abuse as a child and was clearly predisposed to suspect abuse of A.E.P. She admitted she had previously asked A.E.P. 12 to 15 times whether anyone, including her father, had ever sexually touched her. When Deanne and Shawn interrogated A.E.P. after catching her fondling her sister, their motivation was "to know where she learned this." Narrative Report of Proceedings at 42 (Deanne Montgomery). They were essentially looking to find answers of abuse, and it appears Deanne had "a preconceived idea of what the child should be disclosing . . . ." *Michaels* II, 642 A.2d at 1378; *Wright*, 497 U.S. at 813. Petitioner also points out Deanne and Shawn used closed and leading questions.

Other circumstances surrounding the initial interview were also improper, according to Petitioner. A.E.P. had just been caught fondling her sister and was punished by being made to stand in the corner. Deanne's interrogation began immediately after this punishment. A.E.P. was emotionally

distraught and had an apparent motive to lie in order to satisfy Deanne. Deanne herself, at this time, was described by Shawn as being upset and frazzled. Deanne's manner of questioning also demonstrated her bias. Even though A.E.P. said her mother touched her and her mother knew about her father touching her, Deanne failed to pursue A.E.P.'s statement about her mother. Deanne's focusing on A.E.P.'s father easily could have led A.E.P. to embellish in the attempt to appease the questioner.

Petitioner also challenges aspects of Kyle Smith's interview of A.E.P. First, A.E.P. was obviously upset by being taken from a baby-sitter's house by Kyle and a deputy sheriff, both of whom were strangers to A.E.P. Kyle then began to interview A.E.P. at the sheriff's substation while sitting on some steps in the building. At that time, A.E.P. was distracted by the presence of her father, whom Kyle would not allow A.E.P. to see. Finally, the rest of Kyle's interview did not occur until after 8:30 P.M. when A.E.P. was obviously tired after the stressful events of the day. There is no reason why Kyle could not have placed A.E.P. with foster parent Judy Brewer on the first evening and waited until normal daytime hours the next day to interview A.E.P. in a more neutral and relaxed setting. Petitioner also claims Kyle was predisposed to suspect A.E.P.'s father of abuse, as suggested by her failing to pursue questions about A.E.P.'s mother, when Kyle admitted the CPS intake sheet disclosed allegations of abuse by the mother as well. *See Michaels* II, 642 A.2d at 1379-80 ("A lack of objectivity also was indicated by the interviewer's failure to pursue any alternative hypothesis that might contradict an assumption of defendant's guilt. . . .").

Petitioner objects to hearsay statements made during Detective Kelly's interview of A.E.P. because of Kyle Smith's presence and interference with the interview. When Detective Kelly first questioned A.E.P., she repeatedly denied her father had touched her. Hearing A.E.P. give answers inconsistent with Kyle's previous interview, Kyle *intervened and prompted A.E.P. to tell the detective what*

*she had previously told Kyle.* Only *after* Kyle's prompting did A.E.P. then start saying her father had touched her. Kyle also repeated this maneuver during A.E.P.'s interview with Dr. Greenberg, with less success.

As testified by Petitioner's witness, Dr. Greenberg, and as stated in *Michaels* I, the very first interview of the child regarding the abuse is the most important. *See Michaels* I, 625 A.2d at 511-12. Since, Petitioner argues, the first interview of A.E.P. contained many of the improper interview procedures criticized in the *Michaels* cases and in *Idaho v. Wright*, then all her hearsay statements are unreliable; and Petitioner claims the trial court should have held a pretrial taint hearing to address the issue.

■ We decline to adopt a pretrial taint hearing as a requirement for the reason that the existing state of the law adequately addresses Petitioner's concerns. As to the reliability of a child's testimony, a defendant can argue memory taint at the time of the child's competency hearing. If a defendant can establish a child's memory of events has been corrupted by improper interviews, it is possible the third *Allen* factor, "a memory sufficient to retain an independent recollection of the occurrence[,]" may not be satisfied. *Allen*, 70 Wn.2d at 692.

■ ■ As to the reliability of a child's hearsay statements, a defendant can argue memory taint at the pretrial hearing held pursuant to RCW 9A.44.120(1). In determining the reliability of hearsay, we have previously set out nine nonexclusive factors a trial court should consider. *State v. Ryan*, 103 Wn.2d 165, 175-76, 691 P.2d 197 (1984) (adopting the first five factors from *State v. Parris*, 98 Wn.2d 140, 146, 654 P.2d 77 (1982), and the next four factors from *Dutton v. Evans*, 400 U.S. 74, 88-89, 91 S. Ct. 210, 27 L. Ed. 2d 213 (1970)). Petitioner and amicus Washington Association of Criminal Defense Lawyers urge us to reject the *Ryan* factors as being inadequate. We recognize some of the *Ryan* factors have subsequently been criticized as being unhelpful in determining reliability, *see, e.g., State v. Swan*, 114 Wn.2d 613, 650-51, 790 P.2d 610 (1990); *State v. Leavitt*,

111 Wn.2d 66, 75, 758 P.2d 982 (1988); *In re Dependency of S.S.*, 61 Wn. App. 488, 499, 814 P.2d 204 (1991), but we decline to reevaluate the *Ryan* factors at this time because the issues presented here are easily resolved within the *Ryan* framework.

The possibility a child's memory or testimony may have been tainted by improper interviews is easily addressed by the fifth, eighth and ninth *Ryan* factors. "[T]he timing of the declaration and the relationship between the declarant and the witness[,]" *Ryan*, 103 Wn.2d at 176 (fifth factor), allow the court to consider the exact nature of the exchange through which the witness obtained the child's statements. Suggestive interviewing can also affect the eighth *Ryan* factor, "the possibility of the declarant's faulty recollection is remote[.]" *Id.* "The circumstances surrounding the statement . . .," *Id.* (ninth factor), also make room for argument concerning the methodology of the interview. The possibility of suggestive interviews leading to tainted child hearsay statements should definitely be considered by a trial court; and Petitioner did present the issue in the dependency hearing.

Petitioner challenges the trial court's finding that all of A.E.P.'s hearsay statements were reliable. We agree the circumstances surrounding A.E.P.'s disclosures to the Montgomerys would appear to render her initial disclosures highly unreliable. Certain aspects of the subsequent interviews with Kyle Smith and Detective Kelly also cast suspicions on the credibility of A.E.P.'s statements. Petitioner has not alleged any impropriety by Dr. Greenberg or Dr. Cillis, who both interviewed A.E.P. on two different occasions; but A.E.P. refused to say her father had touched her in those interviews. Ultimately, we decline to rule on the reliability of A.E.P.'s hearsay statements under *Ryan*, because the statements—even if reliable—must still satisfy the corroboration requirement. RCW 9A.44.120(2)(b).

█ Direct corroboration of sexual abuse, however desirable from an evidentiary standpoint, is frequently unavail-

able. *State v. Swan*, 114 Wn.2d 613, 623, 790 P.2d 610 (1990). Indirect evidence of abuse can suffice to corroborate a child's hearsay statements, but the evidence must still "support a logical and reasonable inference that the act of abuse described in the hearsay statement occurred." *Id.* at 622 (footnote and internal quotation marks omitted).

Having reviewed the record in its entirety, we find no corroboration supporting A.E.P.'s varied and inconsistent statements concerning her father touching her. In *Swan*, the victims' hearsay statements were corroborated by parallel disclosures, precocious sexual knowledge, masturbatory behavior, behavior with an anatomically correct doll, complaints of pain, and other physical and emotional evidence. *Swan*, 114 Wn.2d at 624-40. The record in this case contains no similar corroboration.

A.E.P.'s physical exams were inconclusive. While an inconclusive exam does not rule out the possibility of abuse, neither does it corroborate the hearsay statements. W.M.P.'s physical exam was consistent with digital fondling, but that evidence does not corroborate A.E.P.'s statements alleging Petitioner touched her.

A.E.P.'s disclosures to the Montgomerys about the touching incident demonstrated only a minor awareness of sexual knowledge, and that knowledge more likely derived from C.M.'s *established* sexual behavior towards A.E.P. Deanne testified about an incident where she caught C.M. "tickling" A.E.P. in the vaginal area while A.E.P.'s pants were pulled down. A.E.P. consistently told every individual who interviewed her C.M. had touched her, and some of those statements imply it happened more than once. As testified by two other children who rode with C.M. on the school bus, C.M. appeared to exhibit a pattern of sexual behavior. A.E.P.'s presence in the Montgomery household establishes a connection between A.E.P.'s knowledge of sexual touching and C.M.'s behavior.

Another possible explanation for A.E.P.'s minor sexual knowledge with regard to the touching is Deanne's repeatedly questioning A.E.P. over a period of time whether

anyone, including her father, had touched her. Deanne's obvious obsession with abuse, culminating in the 45- to 90-minute-long interrogation of A.E.P., could have planted false ideas in A.E.P.'s memory. The details supplied by A.E.P. regarding the touching incident fail to demonstrate any knowledge that A.E.P. could not have picked up from C.M.'s behavior, or from Deanne's questioning.

Alice Eccelston, who baby-sat for over a year before the Montgomerys, and Judy Brewer, foster mother for six weeks after the initial disclosure, both testified they never observed *any* sexualized behavior between the girls. The only such alleged behavior disclosed in the record occurred at the Montgomery house. The fact that A.E.P.'s alleged sexual behavior only occurred in the Montgomery household further suggests a connection between her behavior and previous events in that household. Unlike *State v. Jones*, 112 Wn.2d 488, 497, 772 P.2d 496 (1989), where the record revealed *no other possible source* of the child's sexual knowledge, other than from the defendant, this case presents another strong explanation for A.E.P.'s sexual knowledge and alleged sexual behavior.

A.E.P.'s statements to Kyle Smith, Detective Kelly, and Dr. Cillis about her father wiggling his privates show somewhat more sexual knowledge than can be explained by other possible sources of information. A.E.P. did tell Kyle Smith her father wiggled his privates *while* he touched her, but it is unclear from the record whether A.E.P.'s statements to Detective Kelly linked the touching and wiggling incidents together. A.E.P.'s disclosures about the wiggling to Dr. Cillis do not reveal any sexual act involving the child. A.E.P. told Dr. Cillis her father was not near her, nor was there any interaction between him and her, when she saw him wiggling his privates. Petitioner suggested during the dependency hearing that A.E.P. may have accidentally seen Petitioner masturbating, unbeknownst to him. A.E.P.'s knowledge of masturbation was minimal. She described the erection and wiggling, but she said nothing came from his privates—she had no knowledge of ejaculation. *Compare*

*Swan*, 114 Wn.2d at 627-28 (two three-year-old children described icky milk-like fluid coming from perpetrator's penis).

A.E.P.'s knowledge about the wiggling provides weak corroboration that she saw Petitioner masturbating, but it does not support a logical and reasonable inference that Petitioner sexually abused her or touched her in a sexual way. Absent information showing Petitioner knew or intended A.E.P. to watch him masturbate, A.E.P.'s hearsay statements lack sufficient corroboration of sexual abuse to be admitted under RCW 9A.44.120.

In conclusion, we find A.E.P.'s competence to testify was not properly established, due to the absence of the critical information regarding when the alleged abuse occurred. Because A.E.P. was incompetent to testify, she was unavailable as a witness. Her hearsay statements regarding sexual abuse lack corroboration and cannot be admitted under RCW 9A.44.120. We reverse the finding of abuse which was entered in the dependency hearing.

Petitioner also attacks the legitimacy of the court order requiring him to complete deviancy therapy. Even though the dependency petition was dismissed, Petitioner seems to imply the therapy order continues to affect the issue of the custody of Petitioner's daughters. Having reversed the underlying finding of abuse, we find no need to address subsequent aspects of the dependency court's orders.

One other matter raised by Petitioner can be briefly dismissed. Petitioner urges this court to require child interviews be videotaped so as to enable the defense to thresh out the possibility of suggestive interviewing techniques and possible taint. Petitioner cites no authority for his claim that A.E.P.'s interviews should have been recorded. Furthermore, the issue of requiring audio or videotaped interviews when investigating child sexual abuse is better addressed by the Legislature; and, in fact, the Legislature recently considered and rejected such a requirement. *See* S.S.B. 5087, 55th Leg., Reg. Sess. (1997). Petitioner's claims that A.E.P.'s interviews should have been taped have no merit.

Durham, C.J., and Smith, Johnson, Madsen, Alexander, and Sanders, JJ., concur.

Talmadge, J. (dissenting) — I dissent in this case, not so much because of my disagreement with the majority regarding the principles to be applied in this case,[1] but because the majority largely ignores the standard of review for trial court decisions on child competency and the admissibility of child hearsay. The majority abandons the abuse of discretion standard and undertakes a de novo weighing of the evidence on review. I do not believe this is an appropriate role for an appellate court.

A.  Competency of the Child

The majority correctly applies the five-factor test for child competency set forth in *State v. Allen*, 70 Wn.2d 690, 692, 424 P.2d 1021 (1967). In order to determine a young child is competent, the trial court must determine the child has:

> (1) an understanding of the obligation to speak the truth on the witness stand; (2) the mental capacity at the time of the occurrence concerning which he is to testify, to receive an accurate impression of it; (3) a memory sufficient to retain an independent recollection of the occurrence; (4) the capacity to express in words his memory of the occurrence; and (5) the capacity to understand simple questions about it.

*Allen*, 70 Wn.2d at 692. The majority also correctly notes the standard for review of such decisions is a manifest abuse of discretion, citing *State v. Swan*, 114 Wn.2d 613, 645, 790 P.2d 610 (1990). Majority at 223. However, Washington case law on appellate review has been even more direct in discussing what constitutes proof of a

---

[1]For example, I emphatically agree with the majority that the question of whether the interview of the child "tainted" the child's testimony should be considered in the context of an assessment of the competency of the child witness and the admissibility of the child's hearsay testimony under RCW 9A.44.120. I also agree with the majority that any requirement of videotaping for child interviews awaits an appropriate legislative direction rather than a legislative-style directive from this Court. Majority at 234.

manifest abuse of discretion. As the Court of Appeals stated in *State v. Borland*, 57 Wn. App. 7, 11, 786 P.2d 810, *review denied*, 114 Wn.2d 1026, 793 P.2d 974 (1990):

> There is probably no area of law where it is more necessary to place great reliance on the trial court's judgment than in assessing the competency of a child witness. The trial judge is in a position to assess the body language, the hesitation or lack thereof, the manner of speaking, and all the intangibles that are significant in evaluation but are not reflected in a written record.

*See also State v. Leavitt*, 111 Wn.2d 66, 70, 758 P.2d 982 (1988).

The trial judge in this case carefully assessed A.E.P.'s testimony with all five *Allen* factors in mind. The trial court determined the child was competent to testify.

Nevertheless, the majority substitutes its own judgment for the trial court's that actually heard and saw the witnesses. While the father in this case points to isolated portions of the child's testimony that convey the impression she was unable to differentiate lies from truth, the entirety of her testimony indicates she understood her obligation to testify truthfully. *See State v. L.J.M.*, 129 Wn.2d 386, 398, 918 P.2d 898 (1996). She resisted defense counsel's attempts to elicit an admission the incident never occurred. The testimony also indicates she was able to form present impressions of the incidents, and when they occurred, and recall them consistently thereafter. Given the fact she was five years old at the time and her testimony took place over the course of several hours, it is not surprising that she was at times unable to recall her responses to pretrial statements. Any inconsistency in the child's testimony was an appropriate subject of cross-examination and related to its weight, rather than her competency. *State v. Stange*, 53 Wn. App. 638, 642, 769 P.2d 873, *review denied*, 113 Wn.2d 1007, 779 P.2d 727 (1989).

The majority's principal concern is that the child's testimony did not relate specifically in time to the events.

With this the majority requires a five year old to give an extraordinarily precise account of place, time, and date with respect to past abusive conduct. The majority's temporal standard for child competency is nearly impossible for children of such tender years to meet. The majority effectively makes the testimony of many young children inadmissible per se. Rather than being dispositive of the competency question, the ability or inability of the child to relate abusive conduct to a specific time is simply another factor going to the believability of the child's testimony.

The trial court made its decision based on the totality of the child's testimony. The lack of temporal connection was just one factor before it. Nevertheless, the majority, based on this single, technical consideration from the cold record on appeal, decides the trial court's decision was a manifest abuse of discretion. We should exercise the appropriate restraint appellate courts have traditionally exercised in reviewing child competency questions, and allow our trial courts to decide facts, as trial courts are uniquely constituted to do.[2]

## B. Admissibility of Child Hearsay Under RCW 9A.44.120

Given its ruling on the child's competency to testify, the majority proceeds to analyze the admissibility of hearsay testimony regarding the abuse of the child under RCW 9A.44.120 and *State v. Ryan*, 103 Wn.2d 165, 691 P.2d 197 (1984), the seminal case construing the statute. In *Ryan*, we set forth numerous factors bearing on the reliability of the out of court declarations of the child, culling on factors established in both *State v. Parris*, 98 Wn.2d 140, 654 P.2d 77 (1982), and *Dutton v. Evans*, 400 U.S. 74, 91 S. Ct. 210, 27 L. Ed. 2d 213 (1970). Those factors have been considered

---

[2]"Nevertheless, the Supreme Courts, instead of enforcing this principle rigidly, continue to revise rulings upon the competency of children whom they have never seen or heard. Time should not be wasted on such a task." 2 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 507, at 598 (3d ed. 1940).

at length in numerous Washington cases.[3] The majority here does not depart from the *Ryan* factors.[4]

The majority again fails, however, to set forth the appropriate standard of review for determinations on the admissibility of child hearsay under RCW 9A.44.120. Washington courts have frequently indicated the trial court is in the best position to make the determination of reliability of the declarant's out of court statement, particularly as that court is the only one to see the child and the other witnesses. *Swan*, 114 Wn.2d at 667; *State v. Pham*, 75 Wn. App. 626, 631, 879 P.2d 321 (1994), *review denied*, 126 Wn.2d 1002, 891 P.2d 37 (1995); *State v. Swanson*, 62 Wn. App. 186, 191 n.1, 813 P.2d 614, *review denied*, 118 Wn.2d 1002, 822 P.2d 288 (1991). Determinations of the admissibility of child hearsay testimony lie within the sound discretion of the trial court and ordinarily will not be reversed absent manifest abuse of discretion. *Pham*, 75 Wn. App. at 631.

In the present case, the trial court did not manifestly abuse its discretion. To the contrary: the trial court was extraordinarily conscientious in entering 33 pages of detailed findings of fact and conclusions of law regarding the reliability of the child's out-of-court statements. The child had no apparent motive to lie and did not have an untruthful character, her statements to Montgomery and Smith did not result from leading or suggestive questions, and nothing in the timing of the statements or her relationship with the persons to whom the statements were

---

[3]*E.g., State v. Mitchell*, 117 Wn.2d 521, 529, 817 P.2d 398 (1991), *overruled on other grounds by State v. Dent*, 123 Wn.2d 467, 869 P.2d 392 (1994); *State v. Gregory*, 80 Wn. App. 516, 521, 910 P.2d 505, *review denied*, 129 Wn.2d 1009, 917 P.2d 129 (1996); *State v. Quigg*, 72 Wn. App. 828, 835, 866 P.2d 655 (1994).

[4]The decision of the United States Supreme Court in *Idaho v. Wright*, 497 U.S. 805, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990), on the admissibility of child hearsay evidence does not compel modification of the *Ryan* factors.

Both amici, the Washington Association of Prosecuting Attorneys and the Washington Association of Criminal Defense Lawyers, argue for refinement of the *Ryan* factors. Neither amicus, however, indicates the *Ryan* factors foreclose assessment of the principal issues relating to reliability of child hearsay testimony in a case of child sexual abuse. For this reason, there is no pressing need to depart from the *Ryan* formulation at this time.

made suggested unreliability. Given the entire context of her statements, the trial court reasonably concluded the hearsay was reliable and, therefore, admissible. I see no reason to depart from the trial court's well-sustained findings of fact and conclusions of law on the reliability question.

Unless we are now willing to establish de novo review of all trial court decisions regarding child competency and the admissibility of child hearsay testimony under RCW 9A.44.120 as the operative standard for review, I must respectfully disagree with the majority's conclusion here. Appellate courts cannot readily assess the credibility and demeanor of child witnesses. The issues of child competency and child hearsay in child abuse cases are extraordinarily difficult and sensitive, and the cases are often very controversial and emotional. The trial court here exhibited the appropriate sensitivity and painstaking care in assessing the competency of the child and the reliability of her out of court statements. Nothing in this record suggests the trial court engaged in a manifest abuse of its discretion. I would affirm the trial court's judgment.

GUY, J., concurs with TALMADGE, J.