[No. 24932–1–I. Division One. July 15, 1991.]

THE STATE OF WASHINGTON, *Appellant,* v. GARY M. CARLSON, *Respondent.*

*Norm Maleng, Prosecuting Attorney,* and *Jeanette Dalton, Deputy,* for appellant.

*Catherine Wright Smith, Malcolm L. Edwards,* and *Edwards, Sieh, Wiggins & Hathaway, P.S.,* for respondent.

AGID, J.—The State appeals an order granting Gary Carlson's motion for a new trial. Carlson cross–appeals, contending that several alternative grounds support the

trial court's order. We find no basis for granting a new trial and reinstate the jury's verdict of guilty.

This appeal concerns two charges against Carlson for criminal conduct occurring in January 1989: first degree rape of a child, and first degree child molestation. The victim of the crimes is Carlson's granddaughter, "Z", who was approximately 3½ years old when the sexual abuse occurred.

Carlson has at all times denied the charges. His defense is that Z's mother, Sandy, manufactured the abuse allegations because of concerns about retaining custody of Z, and because she needed the money a postconviction civil suit against Carlson would bring. The jury rejected this defense and found Carlson guilty as charged.

Carlson moved for a new trial. Of the several grounds alleged in support of Carlson's motion, the trial judge found two persuasive: (1) that it was error to admit on cross examination hearsay statements Z made to her father, Mitch; and (2) that it was error to admit hearsay statements Z made to her baby–sitter, Shami. The judge concluded that this improperly admitted testimony may have prejudiced the outcome of trial and granted Carlson's motion.

### STATEMENTS TO FATHER

Mitch, who is Carlson's son, testified for the defense. During cross examination, the prosecutor asked Mitch about conversations he had with Z during supervised visits with her:

Q. Isn't it true that on several of the occasions when you, [the supervisor] and [Z] were in the room, [Z] told you about how your father had abused her?

A. [Z] had repetitiously said, "When do I get to come home over to see [Carlson] and Gummy [Z's grandmother]? As soon as [Carlson] stops doing bad things to me." That was all she said.

Q. At that point, in fact, she described it in a little more detail, didn't she? She talked to you and told you exactly how your father had abused her when she was outside playing?

A. No, not really.

[Defense Counsel]: I'm going to object to this line of questioning.

THE COURT: Overruled.

Q. She told you exactly about how your father did that?

A. No, that was all she said. It was pretty simple, cut and dried, usually, "Do I get to come over as soon as [Carlson] stops touching me down there?" She never did go into detail about it.

The prosecutor had previously given no indication of his intent to elicit this testimony on cross examination.

In his motion for new trial, Carlson argued that this testimony was improperly admitted because it was never tested through an RCW 9A.44.120 reliability hearing. Evidently the trial court accepted this argument; it ruled that admission of the testimony was an error of law that warranted a new trial. This was error.

 The erroneous admission of evidence is grounds for a new trial only when the evidence at issue was timely and specifically objected to at trial. CrR 7.6(a)(6); *see also State v. Leavitt,* 111 Wn.2d 66, 71–72, 758 P.2d 982 (1988) (so long as child victim testifies and there are no confrontation clause problems, defendant's failure to object to admission of hearsay testimony or request a reliability hearing precludes review); *State v. Guloy,* 104 Wn.2d 412, 422, 705 P.2d 1182 (1985) (objection that does not specify the particular ground upon which it is based does not preserve the question for appellate review; party may only assign error on the specific ground of the evidentiary objection made at trial), *cert. denied,* 475 U.S. 1020 (1986). Unless these requirements are satisfied, there is no basis for a new trial and it is error to grant one. *See State v. Bauers,* 23 Wn.2d 462, 466–67, 161 P.2d 139 (1945) (reversing grant of new trial because no objection made at trial to errors the trial judge identified as grounds for a new trial), *overruled on other grounds in Larson v. Seattle,* 25 Wn.2d 291, 171 P.2d 212 (1946).

Carlson never objected to the State's line of questioning on hearsay grounds, nor did he ever argue to the trial court that Mitch's conversations with Z should have been the

subject of an RCW 9A.44.120 reliability hearing. Instead, Carlson's only objection was nonspecific and general: "I'm going to object to this line of questioning." Carlson therefore waived any error in admitting Mitch's hearsay testimony and the court erred in granting a new trial on this basis.

STATEMENTS TO SITTER

Shami is a 14–year–old who took care of Z for the first time in April 1989, 3 months after the abuse occurred. At that time, Shami was unaware of any abuse allegations. Pursuant to the trial judge's pretrial ruling under RCW 9A.44.120, Shami was permitted to testify that she put Z to sleep, that Z woke up after about one–half hour, and that when she awoke, Z:

> was very, very upset. She was crying and screaming. And I was trying to control her.
> And I asked her what was wrong. She told me that [Carlson] hurt her, and she pointed down to her private spots.
> I didn't say anything else. She was really upset.

Shami explained that Z's "private spot" is her vagina.

In his motion for new trial, Carlson argued that Shami's testimony was improperly admitted because Z's statements to Shami were made several months after the alleged abuse occurred, and after numerous interviews and several months of counseling. According to Carlson, these factors made Z's postnightmare statements unreliable within the meaning of RCW 9A.44.120 and *State v. Ryan,* 103 Wn.2d 165, 691 P.2d 197 (1984).[1] Carlson further argued that Z's

---

[1] In *Ryan* the court identified several factors to consider in deciding whether a child's out–of–court statements are sufficiently reliable to be admitted: (1) whether there is an apparent motive to lie; (2) the declarant's general character; (3) whether more than one person heard the statements; (4) whether the statements were made spontaneously; (5) the timing of the declaration and the relationship between the declarant and the witness; (6) whether the statement contains express assertions about past fact; (7) whether cross examination could not show the declarant's lack of knowledge; (8) the possibility of the declarant's faulty recollection is remote; and (9) the circumstances surrounding the statement are such that there is no reason to suppose the declarant misrepresented defendant's involvement. 103 Wn.2d at 175–76.

nightmare and statements could have been the product of the many repetitions of abuse allegations, as opposed to her memory of the actual incident. The trial court found these arguments persuasive and granted a new trial pursuant to CrR 7.6(a)(6), which allows a new trial for "[e]rror of law occurring at the trial and objected to at the time by the defendant."

The grant or denial of a new trial is a matter within the trial court's discretion. The trial court's decision will be disturbed only for a clear abuse of that discretion or when it is predicated on an erroneous interpretation of the law. *State v. Jackman*, 113 Wn.2d 772, 777, 783 P.2d 580 (1989); *State v. Wilson*, 71 Wn.2d 895, 899, 431 P.2d 221 (1967). We need not determine whether an abuse of discretion occurred here because we are convinced that the trial court committed an error of law in determining that Shami's testimony was unreliable and inadmissible under *Ryan* and RCW 9A.44.120.

The trial judge's conclusion that Shami's testimony was improperly admitted was premised in part on his determination that Z's postnightmare statements did not satisfy the spontaneity element of *Ryan*. In making this determination, the court relied on an improper definition of spontaneous. Rather than analyzing spontaneity in terms of child hearsay, the trial court relied on the spontaneity definition used in applying the excited utterance exception to the hearsay rule.[2]

---

[2]A statement is not admissible as an excited utterance unless it relates to the main event, is a natural declaration growing out of the event, is a spontaneous or instinctive utterance dominated or evoked by the occurrence itself, and is made at a time that excludes the presumption it is the result of deliberation. ER 803(a)(2); *see also Beck v. Dye*, 200 Wash. 1, 9–10, 92 P.2d 1113, 127 A.L.R. 1022 (1939). It is clear from his oral opinion that the trial judge used this definition to determine whether Z's statements to Shami were spontaneous. The judge said:

[s]pontaneity is defined as a statement that is made close enough to the event or the investigation of the event that it adds credibility.

In other words, it's just something the child says, either in response to a situation or to a question. Neither one of these occurred. . . . The one statement was as a result of a nightmare, and it didn't really describe anything; just that [Carlson] hurt me down there.

■ For purposes of a child hearsay analysis, spontaneous statements are statements the child volunteered in response to questions that were not leading and did not in any way suggest an answer. *State v. Henderson,* 48 Wn. App. 543, 550, 740 P.2d 329, *review denied,* 109 Wn.2d 1008 (1987); *accord, State v. McKinney,* 50 Wn. App. 56, 63 n.4, 747 P.2d 1113 (1987), *review denied,* 110 Wn.2d 1016 (1988). Unlike an excited utterance, the statements need not be contemporaneous with the event in question. *Cf. Henderson,* 48 Wn. App. at 545, 550–51. Z's postnightmare statements, which were made in response to Shami's general inquiry as to what was wrong, unquestionably satisfy these requirements. The court therefore erred in ruling that Z's statements were inadmissible because they were not spontaneous.

The trial judge also premised his decision to grant a new trial on a determination that Z's counseling and the lapse of time between the abuse and Z's statements to Shami necessarily made those statements unreliable. This, too, was error.

■ We recognize that a lapse of time and intervening counseling could affect the reliability of a child's statements regarding abuse. The underlying issue in any RCW 9A.44-.120 determination is whether the time, content, and circumstances of the statement provide sufficient indicia of reliability. *E.g., State v. Swan,* 114 Wn.2d 613, 647, 790 P.2d 610 (1990), *cert. denied,* 111 S. Ct. 752 (1991). "[I]t is *possible* that '[i]f there is evidence of prior interrogation, prompting, or manipulation by adults, spontaneity may be an inaccurate indicator of trustworthiness.'" (Italics ours.) *Idaho v. Wright,* __ U.S. __, 111 L. Ed. 2d 638, 110 S. Ct. 3139, 3152 (1990) (quoting *State v. Robinson,* 153 Ariz. 191, 201, 735 P.2d 801, 811 (1987)). However, as the *Wright* Court's careful language makes clear, these factors will not affect reliability in all cases.[3] We hold, therefore, that a

---

[3]Such a rule would be unworkable in any event. Were the courts to hold as a matter of law that counseling affects a child's reliability, an abused child would be

trial judge may find child hearsay statements unreliable on the ground that there has been a lapse of time and intervening counseling between the abuse and the statements at issue only when the evidence demonstrates that the lapse or counseling somehow affected the child's statements.

No such evidence exists here. Z's pre- and postcounseling statements are substantially the same. Even after counseling, Z continued to use the same age–appropriate descriptions of the abuse that she used from the outset. Nothing in the record indicates that Z was manipulated or somehow prompted to accuse Carlson of abuse by her counseling. Accordingly, the trial court erred in ruling Z's statements to Shami unreliable and their admission at trial error. The trial court's order granting a new trial on this basis is reversed.[4]

### ISSUES RAISED ON CROSS APPEAL
### AS ALTERNATIVE GROUNDS FOR NEW TRIAL

Z's competency. Carlson has filed a cross appeal in which he raises several alternative grounds for affirming the trial court. The first is that the trial judge erred in ruling Z competent to testify at trial. We question whether this issue has been preserved for review. *Compare State v. Cooley,* 48 Wn. App. 286, 290–91, 738 P.2d 705 (court refused to review trial court determination that child was competent because issue was raised for the first time on appeal), *review denied,* 109 Wn.2d 1002 (1987) *with Swan,* 114 Wn.2d at 646 (when trial court rules witness is incompetent to testify, "[a]rguably, the competency issue can be

---

prevented from receiving much needed help until after trial. To treat a lapse of time between abuse and accusatory statements as necessarily indicative of unreliability would also overlook the tendency of abuse victims to delay reporting that abuse occurred. *State v. Petrich,* 101 Wn.2d 566, 573–76, 683 P.2d 173 (1984); *State v. Madison,* 53 Wn. App. 754, 765, 770 P.2d 662, *review denied,* 113 Wn.2d 1002 (1989).

[4]By this holding, we express no opinion as to whether the fact that Z's statement was apparently the result of a nightmare affected its reliability. The trial court did not appear to rely on this rationale as a reason for granting Carlson a new trial, and neither party has fully briefed this theory on appeal.

raised for the first time on appeal on the basis that the showing of unavailability is constitutionally mandated when the declarant witness, whose testimony is to be used against the defendant, is not produced"). Nevertheless, we exercise our discretion to discuss the merits. RAP 2.5(a).

██ ██ A child witness is deemed competent to testify if he or she demonstrates: (1) an understanding of the duty to speak the truth on the witness stand; (2) the mental capacity at the time of the occurrence concerning which he or she is to testify to receive an accurate impression of it; (3) sufficient memory to retain an independent recollection of the occurrence; (4) the capacity to express in words his or her memory of the occurrence; and (5) the capacity to understand simple questions about it. *E.g., Swan,* 114 Wn.2d at 645. Any inconsistencies in the child's testimony go to weight and credibility, not competency. *State v. Stange,* 53 Wn. App. 638, 642, 769 P.2d 873, *review denied,* 113 Wn.2d 1007 (1989); *McKinney,* 50 Wn. App. at 64.

> The determination of the witness's ability to meet the requirements of the [competency] test rests primarily with the trial judge who sees the witness, notices his manner, and considers the witness's capacity and intelligence. Because such matters are not reflected in a written record for appellate review, their determination lies within the sound discretion of the trial judge[.]

(Citations omitted.) *State v. Justiniano,* 48 Wn. App. 572, 578, 740 P.2d 872 (1987); *accord, State v. Borland,* 57 Wn. App. 7, 11, 786 P.2d 810, review denied, 114 Wn.2d 1026 (1990).

██ We hold that the trial court did not abuse its discretion in ruling Z competent to testify.[5] Z demonstrated her ability to distinguish between the truth and a lie and gave consistent testimony about Carlson's acts. She was able to testify accurately about her age and her friends'

---

[5]Because we hold that Z was competent to testify, we do not address Carlson's related insufficiency of the evidence argument, which is apparently based on the requirement of RCW 9A.44.120(2)(b) that when a child is unavailable as a witness, hearsay testimony about the child's statements is inadmissible unless there is "corroborative evidence of the act."

names and to identify people in the courtroom.[6] Although Z clearly did not want to testify about the abuse, a child's reluctance to testify about specific acts of abuse does not render him or her incompetent. *See Leavitt,* 111 Wn.2d at 69–70 (affirming competency ruling for child whose testimony at competency hearing was given through social worker to whom child whispered answers).[7]

Evidence of Sandy's cocaine use. Carlson next contends that the trial court erred by excluding evidence that Z's mother, Sandy, abused cocaine during the fall of 1988. The evidence was the subject of a motion in limine to exclude brought by the State. The trial court deferred ruling on the State's motion, although it indicated that it believed the evidence was not relevant and was highly prejudicial. Sandy then testified. She denied using cocaine in the fall of 1988 and the winter of 1989. After Sandy testified, Carlson did not again offer his cocaine–use evidence.

Initially, we note that this issue has not been preserved for review. Although the trial judge's rulings on the State's motion were clearly tentative, Carlson never sought a final decision. He therefore waived any error in excluding that evidence under the rule that, when a ruling on a motion in limine is tentative, any error in admitting or excluding evidence is waived unless the trial court is given an opportunity to reconsider its ruling. *Sturgeon v. Celotex Corp.,* 52 Wn. App. 609, 621–23, 762 P.2d 1156 (1988).

In any event, the trial court was well within its discretion in refusing the evidence. The alleged cocaine use about which Carlson sought to offer testimony occurred before

---

[6]We acknowledged that these abilities are indicia of competence in *Stange,* 53 Wn. App. at 542.

[7]On a related matter, we note that the trial judge's decision to grant a new trial may have been influenced by defense counsel's difficulty in cross–examining Z at trial. This would be improper. The right to confront witnesses guarantees only the opportunity for effective cross examination, not cross examination that is effective. *United States v. Owens,* 484 U.S. 554, 559–60, 98 L. Ed. 2d 951, 108 S. Ct. 838 (1988); *see also McKinney,* 50 Wn. App. at 63–64.

Sandy reported Z's abuse and thus had little, if any, bearing on her motive to make those allegations.[8] Consequently, the evidence's probative value was vastly outweighed by its unduly prejudicial effect. ER 403.

Moreover, the evidence would have been properly excluded under the rule that extrinsic evidence cannot be used to impeach a witness on collateral issues. *Jacqueline's Wash., Inc. v. Mercantile Stores Co.,* 80 Wn.2d 784, 788–89, 498 P.2d 870 (1972); *State v. Harp,* 13 Wn. App. 273, 276, 534 P.2d 846, *review denied,* 85 Wn.2d 1016 (1975). This rule applies even when, as here, the extrinsic evidence may have some indirect bearing on motive, bias or prejudice. *State v. Reed,* 25 Wn. App. 46, 52, 604 P.2d 1330 (1979) (motive); *State v. Roberts,* 25 Wn. App. 830, 834, 611 P.2d 1297 (1980) (trial court may exclude evidence tending only remotely to show bias or prejudice).

Evidence concerning divorce. Carlson also contends that he was so prejudiced by the trial court's admission of evidence that Carlson's wife filed for divorce in 1979, that he should have been granted a new trial. Given the circumstances of the admission of this testimony, Carlson's allegation has no merit.

While cross–examining Mrs. Carlson, the prosecutor asked whether she ever filed for divorce. Carlson objected; the trial judge sustained his objection and instructed the jury to disregard the question. Later, Carlson asked whether he could recall Mrs. Carlson for the purpose of establishing that she had filed for divorce in 1979—even before Z was born—and that she had abandoned the proceedings in the same year. The trial judge allowed the testimony.

Given these circumstances, Carlson's claim that the prosecutor's improper question requires a new trial has no

---

[8]Carlson argued that the evidence was relevant to explain Sandy's "paranoia" about losing custody of Z, and to explain her financial need and motive for making charges against Carlson.

basis. Carlson promptly objected to the evidence, his objection was sustained, and the jury was instructed to disregard the question. The jury is presumed to have followed instructions by the court. *E.g., State v. Grisby,* 97 Wn.2d 493, 499, 647 P.2d 6 (1982), *cert. denied,* 459 U.S. 1211 (1983). Nothing in the record rebuts that presumption. Accordingly, there is no basis in the record for concluding that the question prejudiced Carlson.

 Nor is the admission of Mrs. Carlson's testimony a basis for granting a new trial. It was Carlson who called Mrs. Carlson to the stand in order to provide the jury with additional information about her divorce petition. Thus, if it was error to allow her testimony, that error was caused by Carlson. A party may not set up an error at trial and then complain of it on appeal. *State v. Pam,* 101 Wn.2d 507, 511, 680 P.2d 762 (1984); *State v. Braxton,* 20 Wn. App. 489, 493, 580 P.2d 1116 (1978), *review denied,* 91 Wn.2d 1018 (1979).

Juror misconduct. Next Carlson contends that the trial court should have granted a new trial on the basis of misconduct by one of the jurors, J.K. The trial court correctly rejected this allegation.

During voir dire, J.K. was asked whether she had "any particular background in the subject of child sexual abuse or evidence of sexual abuse". J.K. said she had not. J.K. was also asked whether she knew someone who had been sexually abused. J.K. answered affirmatively, and said that a friend had been sexually abused as a child by a family member. J.K. also volunteered that she was a sober alcoholic and a member of AA.

After the verdict was entered, J.K. revealed that over the years she had read a great deal about dysfunctional families. She also admitted that during deliberations, she used "the term 'pedophile' several times", and that she had made a comment that pedophiles come from all walks of life. Based on this information, Carlson argues that J.K.'s voir dire answer that she did not have particular knowledge about child abuse was false and that her misrepresentation

requires a new trial. He also argues that J.K.'s comments about pedophiles introduced extraneous evidence into deliberations. We disagree.

When a juror fails to disclose information during voir dire, a new trial is warranted when the information withheld is material and a truthful response would have provided a basis for challenge for cause. *State v. Briggs,* 55 Wn. App. 44, 52, 776 P.2d 1347 (1989). Neither of these requirements is met here. J.K. did not fail to disclose material information, since her knowledge about dysfunctional families is not tantamount to particular knowledge about child abuse. Moreover, J.K.'s knowledge would not have supported a challenge for cause. J.K.'s friendship with a victim of sexual abuse, a fact Carlson did not perceive to be a basis for either a challenge for cause or a peremptory challenge, is far more pertinent to potential bias than are her readings on dysfunctional families.

As for J.K.'s comments during deliberations, a juror is expected to bring his or her opinions, insights, common sense, and everyday life experiences into deliberations. *Briggs,* 55 Wn. App. at 58. He or she may not, however, introduce highly specialized knowledge into the jury's deliberations. *Briggs,* 55 Wn. App. at 58–59. The comments at issue here are not "highly specialized knowledge". Instead, J.K.'s comment that child abusers come from all walks of life was a simple commonsense observation. Her use of the term "pedophile" indicates that J.K. has a good vocabulary, but hardly qualifies as introducing specialized knowledge or specific facts to the jury. *See generally State v. Briggs, supra* (new trial warranted when juror related personal experience with control of stuttering, an issue on which experts had testified at trial).

Discovery violations. Carlson's final contention is that because the State did not provide him with exculpatory discovery material until after trial, he was entitled to a new trial. The material at issue is a report from Childhaven which established that as late as July 7, 1989, Z complained

of burning during urination. A similar complaint Z made to Sandy in January 1989 prompted the questions by Sandy which revealed the alleged abuse.

Carlson argued in his motion for new trial that by withholding the Childhaven notes, the State violated CrR 4.7(a)(3) and *Brady v. Maryland,* 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). According to Carlson, this required a new trial. The trial court rejected Carlson's argument on the ground that the State made the notes available to Carlson as soon as it acquired them, and thus did not violate CrR 4.7.[9] The record supports the trial court's ruling.

Moreover, even if the State had been dilatory in revealing the Childhaven notes, its acts would not require a new trial. Withholding exculpatory evidence raises constitutional fair trial concerns only when the evidence, evaluated in the context of the entire record, creates a reasonable doubt about defendant's guilt that did not otherwise exist. *State v. Bebb,* 108 Wn.2d 515, 522–23, 740 P.2d 829 (1987); *see also United States v. Bagley,* 473 U.S. 667, 682, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985). This standard is not met here. The Childhaven notes are exculpatory only in that they indicate there is an innocent explanation for Z's pain at urination. The existence of such an explanation was already before the jury.[10] Consequently, the exculpatory value of the notes was merely cumulative and would not have created a reasonable doubt as to Carlson's guilt that did not otherwise exist.

---

[9]CrR 4.7(a)(3) requires a prosecutor to disclose any information which tends to negate defendant's guilt as to the charged offense. CrR 4.7(h)(2) imposes a duty continuing through trial to disclose such information promptly after its discovery. *See generally State v. Oughton,* 26 Wn. App. 74, 79, 612 P.2d 812 (1980) (CrR 4.7(h)(2) means disclosure at moment of discovery or confirmation, even when that occurs during trial).

[10]Sandy testified that Z's pain at urination seemed to result from soap allergies.

The order granting a new trial is reversed. The jury's guilty verdict is reinstated and the case is remanded to the trial judge for imposition of sentence.

FORREST and BAKER, JJ., concur.