FILED
COURT OF APPEALS
DIVISION II

2014 OCT 29 AM 9: 58

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 44177-2-II |
| Respondent, | |
| v. | |
| STEVEN L. HESSELGRAVE, | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, C.J. — Steven Hesselgrave appeals his conviction and sentence for first degree rape of a child. He argues that (1) his Sixth Amendment right to present a defense was violated by trial court rulings that improperly limited his right to cross-examine witnesses and improperly excluded evidence, (2) he received ineffective assistance of counsel, (3) the trial court abused its discretion in finding the victim competent to testify and in admitting child hearsay statements, (4) the prosecutor committed misconduct by using a "false choice" argument, and (5) the trial court abused its discretion by imposing certain community custody conditions. We hold that (1) any error associated with the trial court's limitation of Hesselgrave's right to cross-examine witnesses was harmless and the trial court did not violate Hesselgrave's right to present a defense by improperly excluding evidence, (2) counsel was not deficient in his representation, (3) the trial court did not err in finding the victim competent to testify, and (4) the State did not argue a "false choice" to the jury. Finally, we accept the State's concession regarding community custody

condition number 13, remand to clarify condition 16, and remand to strike condition number 25. We affirm the conviction and remand to correct the community custody conditions.

FACTS

I. BACKGROUND

In 2011, S.L. was an eight-year-old female student attending elementary school. Hesselgrave is S.L.'s former step-father. One May afternoon, S.L. disclosed sexual abuse by her step-father. Laurel Powell, the school counselor, reported the matter to Child Protective Services (CPS). CPS social worker Christine Murillo conducted a "safety interview" with S.L. on May 17, during which S.L. disclosed sexual abuse by her stepfather. On May 25, Cornelia Thomas, an employee of the Child Advocacy Center in Pierce County, conducted a forensic interview with S.L. S.L. made several detailed disclosures to Thomas that involved allegations of oral, vaginal, and anal intercourse. S.L. testified consistently with these disclosures at trial. According to Thomas, S.L. maintained sufficient memory to have an independent recollection of the occurrence, S.L.'s statements describing the incident appeared to be based on her perception, S.L. communicated "quite well," and S.L. was able to distinguish truth from lies. 6 Report of Proceedings (RP) at 677.

On the night of the incident, Hesselgrave also showed S.L. magazines depicting naked women, in addition to a video on his computer which featured an elephant touching a woman's

2

vagina. S.L. declared that on the same night, Hesselgrave woke up her brother, J.H.,[1] told him to take off his clothes, and instructed S.L. to bite J.H's penis, a request with which S.L. complied.[2]

On June 2, Detectives Jennifer Quilio and Brad Graham interviewed Hesselgrave at police headquarters. When asked if there was any reason that S.L. may have seen his penis, Hesselgrave responded that it was possible because he watched pornography at night in the living area of his apartment when he thought the children were sleeping. Hesselgrave surmised that S.L. could have woken up and inadvertently seen him masturbating. Aware of S.L.'s allegations, Detective Quilio asked Hesselgrave whether he viewed pornography that contained images of animals and women engaging in sexual acts. Hesselgrave admitted that he did, but claimed that he had never seen a video involving an elephant. Hesselgrave denied any sexual contact with S.L.

The day after his police interview, Hesselgrave told Leona Ling,[3] S.L.'s mother, that she would never see him again and that he was leaving with their sons. Ling then called 911 to report what she believed to be an imminent kidnapping. Patrol officers arrested Hesselgrave. The State charged Hesselgrave with first degree rape of a child contrary to RCW 9A.44.073.[4]

---

[1] J.H. is S.L.'s half-brother and Hesselgrave's biological son. J.H. would have been either five or six at the time of the alleged abuse.

[2] J.H. testified that he had no recollection of this incident.

[3] Ling is also the mother of Hesselgrave's two sons.

[4] RCW 9A.44.073 provides,
> (1) A person is guilty of rape of a child in the first degree when the person has sexual intercourse with another who is less than twelve years old and not married to the perpetrator and the perpetrator is at least twenty-four months older than the victim.
> (2) Rape of a child in the first degree is a class A felony.

## II. PROCEDURE

### A. PRETRIAL MOTIONS

Before trial, the court held a hearing to address Hesselgrave's challenge regarding S.L's competence to testify. The State called numerous witnesses including Murillo, Thomas, S.L, and others. The trial court also admitted and published the digital video disc recording of S.L's interview with Thomas.

At the hearing, Hesselgrave argued that S.L. failed to show that she had an independent memory of the incident and that she had difficulty distinguishing truth from lie because she did not understand the concept of a mistake. The trial court considered the timing of the incident in addition to the *Allen*[5] factors and found that Hesselgrave had failed to overcome the presumption that S.L. was competent to testify.

Also before trial, the State moved to admit S.L.'s statements to Thomas, Murillo, and the classmates to whom she made the initial disclosures under RCW 9A.44.120, the child hearsay statute. The court considered the *Ryan*[6] factors and determined that S.L.'s statements were admissible provided that S.L. also testified.

### B. TRIAL

At trial, during cross-examination of S.L., Hesselgrave asked S.L. about a pretrial defense interview of S.L. conducted by defense counsel and investigator Julie Armijo, but S.L. testified that she had no recollection of such an interview. Hesselgrave then asked a series of additional

---

[5] *State v. Allen*, 70 Wn.2d 690, 424 P.2d 1021 (1967).

[6] *State v. Ryan*, 103 Wn.2d 165, 691 P.2d 197 (1984).

questions attempting to highlight S.L.'s inconsistent recitations of the incident. S.L. denied having made such inconsistent statements. Hesselgrave continued with this line of questioning, but the State began to object, arguing that the questions were cumulative, asked and answered, and "[ER] 613." 3 RP at 349. Hesselgrave argued that he was attempting to impeach S.L., but the court sustained the objections. Hesselgrave finished cross-examination, but reserved the right to recall S.L.

Later, during direct examination of Armijo, Hesselgrave asked a series of similar questions, again attempting to demonstrate that S.L.'s responses during the defense interview were frequently inconsistent with S.L.'s trial testimony. After several of these questions were answered, the State again objected, citing improper impeachment and improper questioning.

Outside the jury's presence, the parties argued as to whether S.L.'s interview responses were inconsistent with her trial testimony. The court agreed that the interview transcript contained inconsistencies, but nevertheless sustained the State's objection, noting that under ER 613(b), extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon. The court found that requirement unmet and ruled that Hesselgrave was not allowed to ask additional questions of Armijo from S.L.'s interview transcript.

Hesselgrave argued that the opportunity to explain did not have to occur prior to the introduction of the extrinsic evidence. Defense counsel then sought to recall S.L. The trial court said it would allow a few questions, but it placed limitations on the subject matter of the questions Hesselgrave could ask. Hesselgrave objected to this limitation on his right to cross-examination

"of the only witness in this case." 7 RP at 782. Hesselgrave later recalled both S.L. and Armijo, but asked few questions of either witness, citing constraint by the court's earlier ruling.

Again, outside the jury's presence, Hesselgrave sought to admit documents related to divorce proceedings between himself and Ling, which he argued supported Hesselgrave's theory that Ling prompted S.L. to make false accusations because Ling was unhappy with the terms of the divorce. The trial court allowed some limited questioning of Ling on this topic, but it refused to admit the documents because they contained prejudicial, irrelevant information about Ling's history of substance abuse.

In closing argument, the State contended that, in its view, there were only three possibilities in the case. The prosecutor said,

> So here's what it really comes down to in this case. There's three possibilities for what happened: Someone coached [S.L.]; [S.L.] made it up on her own, or she is telling the truth. That's it.

7 RP at 938. The State also utilized a "Power Point" slide, which displayed these three "options" ordered numerically. Hesselgrave objected, citing improper argument, but the court overruled. In rebuttal closing, the prosecutor said that "it can't be explained through coaching or planning," an argument that also drew Hesselgrave's objection on grounds that it constituted "burden shifting." 7 RP at 975. This objection was also overruled. Hesselgrave was convicted as charged.

At sentencing, in addition to incarceration, the court imposed community custody along with certain associated conditions, including the following:

> 13.     You shall not possess or consume any controlled substances without a valid prescription from a licensed physician.
>
> . . . .
>
> 16.     . . . Do not have any contact with physically or mentally vulnerable individuals.
>
> . . . .

6

25.     Do not possess or peruse any sexually explicit materials in any medium. Your sexual deviance treatment provider will define sexually explicit material. Do not patronize prostitutes or establishments that promote the commercialization of sex. Also, do not possess or use any cell phone that may provide access to the Internet as well.

Clerk's Papers (CP) at 243-44. Hesselgrave appeals.

ANALYSIS

I.  RIGHT TO PRESENT A DEFENSE

Hesselgrave argues that the State violated his constitutional right to present a defense when the trial court limited his ability to impeach S.L. on cross-examination and when the court excluded evidence related to Hesselgrave and Ling's dissolution proceedings. We hold that any error associated with his right to confrontation and cross-examination was harmless and that the court did not err by properly excluding evidence.

A.  STANDARD OF REVIEW

"'The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.'" *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)). A defendant's right to an opportunity to be heard in his defense, including the rights to examine witnesses against him and to offer testimony, is basic in our system of jurisprudence. *Chambers*, 410 U.S. at 294. "The right to confront and cross-examine adverse witnesses is [also] guaranteed by both the federal and state constitutions." *State v. Darden*, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002) (citing *Washington v. Texas*, 388 U.S. 14, 23, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967)). Ordinarily, we review a trial court's decision to limit cross-examination of a witness for impeachment purposes for abuse of discretion. *State v. Aguirre*, 168 Wn.2d 350,

361-62, 229 P.3d 669 (2010). But a court "'necessarily abuses its discretion by denying a criminal defendant's constitutional rights.'" *State v. Iniguez*, 167 Wn.2d 273, 280, 217 P.3d 768 (2009) (quoting *State v. Perez*, 137 Wn. App. 97, 105, 151 P.3d 249 (2007)). And we review a claim of a denial of Sixth Amendment rights de novo. *Iniguez*, 167 Wn.2d at 280-81. Because Hesselgrave argues that the trial court violated his constitutional right to present a defense, our review is de novo. *Iniguez*, 167 Wn.2d at 280-81. Any error, however, is harmless "'if we are convinced beyond a reasonable doubt that any reasonable jury would have reached the same result without the error.'" *Jones*, 168 Wn.2d at 724 (quoting *State v. Smith*, 148 Wn.2d 122, 139, 59 P.3d 74 (2002)).

## B. IMPEACHMENT OF S.L.

ER 613(b) provides,

> **(b) Extrinsic Evidence of Prior Inconsistent Statement of Witness.** Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in rule 801(d)(2).

Our courts have concluded that under ER 613(b), a witness may be impeached with a prior inconsistent statement either before or after the extrinsic evidence is introduced so long as the witness being impeached is subject to recall. *State v. Horton*, 116 Wn. App. 909, 916, 68 P.3d 1145 (2003) (citing *State v. Johnson*, 90 Wn. App. 54, 70, 950 P.2d 981 (1998)).

Here, after her cross-examination, Hesselgrave unequivocally reserved the right to recall S.L. Thus, the trial court erred in placing limitations on Hesselgrave's ability to impeach S.L. solely on grounds that she was not given an opportunity to explain or deny her inconsistent

8

statements during cross-examination.[7] But error is not prejudicial unless "'we are convinced beyond a reasonable doubt that any reasonable jury would have reached the same result without the error.'" *Jones*, 168 Wn.2d at 724 (quoting *Smith*, 148 Wn.2d at 139).

We now look at whether the error was prejudicial. Here, a review of the record reveals that answers to several of the most crucial questions that Hesselgrave sought to ask S.L. on recall were either elicited from S.L. herself or from other witnesses, namely, Armijo. By way of this questioning, Hesselgrave was able to emphasize the fact that S.L. had been inconsistent in her recollection of the events. When Armijo testified, she was questioned about S.L.'s response when asked whether she recalled what happened with Hesselgrave. Armijo, reading from the transcript of the defense interview, testified that S.L. answered, "'I forgot. It's been like a long time since that happened.'" 6 RP at 743. Armijo also testified that S.L. answered "no" when asked specifically whether S.L. told anyone at school about what happened, generally whether she had told anyone what happened with Hesselgrave, whether she had ever made a comment about Hesselgrave's penis,[8] whether S.L. had seen her dad watching movies with naked people in them, when asked whether she told anyone she was touched in an improper way, and that S.L. answered "yes" when asked whether she wanted to live with her brothers and whether Hesselgrave going to jail would make that easier.

---

[7] Hesselgrave also argues in the alternative that he received ineffective assistance of counsel to the extent that his counsel failed to lay the proper foundation for S.L.'s impeachment. But because we determine that the trial court, and not Hesselgrave's counsel, misinterpreted ER 613, we conclude that Hesselgrave's attorney's performance was not deficient and, thus, Hesselgrave's ineffective assistance of counsel claim necessarily fails.

[8] S.L. referenced Hesselgrave's penis during her initial disclosures of abuse.

Accordingly, the trial court's ruling limiting Hesselgrave's ability to impeach S.L. was harmless. Hesselgrave was able to attack S.L.'s credibility by showing the jury, through defense witnesses, that S.L.'s recollection of the events was at times contradictory, if not completely inaccurate. The jury was free to decide that such inconsistencies rendered S.L.'s testimony unreliable and her credibility suspect. Consequently, Hesselgrave cannot show that a reasonable jury would have reached a different result had he been able to continue questioning S.L. *Jones*, 168 Wn.2d at 724. Thus, although the trial court arguably limited Hesselgrave's ability to conduct cross-examination, we hold that any error was harmless. Further, this error did not prevent Hesselgrave from presenting his defense. [9]

### C. DISSOLUTION PLEADINGS

Hesselgrave asserts that the trial court further violated Hesselgrave's rights to present a defense by excluding documents related to Hesselgrave's divorce from Ling. We disagree.

We review de novo whether a trial court's evidentiary ruling violated a defendant's Sixth Amendment right to present a defense. *Jones*, 168 Wn.2d at 719. The right to present a defense is not absolute. *Jones*, 168 Wn.2d at 720. Defendants have a right to present only relevant evidence, with no constitutional right to present *irrelevant* evidence. *Jones*, 168 Wn.2d at 720 (citing *State v. Gregory*, 158 Wn.2d 759, 786 n.6, 147 P.3d 1201 (2006)). Evidence is relevant when it has any tendency to make the existence of any fact that is of consequence to the

---

[9] When Hesselgrave recalled S.L., the trial court placed limitations on the scope of S.L.'s questioning. The trial court discussed the limitations after hearing the State's argument that Hesselgrave already had a chance to cross-examine S.L. and that he should not be entitled to call her as a witness. In this way, the trial court's ruling was more akin to a ruling in limine than it was a limitation of Hesselgrave's right to cross-examine witnesses.

determination of the action more probable or less probable than it would be without the evidence. ER 401.

Here, Hesselgrave urged the trial court to admit various documents and findings of fact from his dissolution proceedings to show that Ling was unhappy with the parenting plan, custody determination, and child support obligation and that, therefore, Ling could have influenced S.L.'s disclosures because she had a motive to retaliate.

The trial court agreed that evidence of Ling's dissatisfaction with the dissolution proceedings might be relevant to show motive to fabricate allegations. Accordingly, the court allowed Hesselgrave to ask Ling questions on cross-examination regarding her dissatisfaction with the parenting plan, custody arrangement, and child support order. Hesselgrave was able to elicit testimony that Ling wished to change the parenting plan and modify the child support order to reduce her monthly obligation. Thus, the jury was aware of Ling's frustration concerning the arrangement with Hesselgrave and the possibility that she might be vindictive for the same reason.

But the trial court declined to admit the documents because those documents revealed that Ling had a history of emotional impairment, substance abuse, and parenting issues. The trial court correctly recognized that admitting findings that suggest that Ling has a history of emotional impairment and substance abuse would have been irrelevant and unduly prejudicial.[10] Evidence of Ling's substance abuse history does not have any tendency to make the existence of any fact

---

[10] The court cited ER 404(b), which provides,
> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

that is of consequence to the determination of this action more probable or less probable. ER 401. Accordingly, the trial court did not err and its ruling did not violate Hesselgrave's right to present a defense.

## II. COMPETENCE TO TESTIFY

Hesselgrave argues that the trial court abused its discretion in finding S.L. competent to testify because (1) her statements were unreliable and (2) there was insufficient corroborating evidence to support the conviction. We hold that the trial court did not abuse its discretion by finding S.L. competent to testify. We hold further that corroborating evidence was not required because S.L. was not "unavailable."

### A. STANDARD OF REVIEW

An appellate court will not disturb a trial court's conclusion as to the competency of a witness to testify except for abuse of discretion. *State v. S.J.W.*, 170 Wn.2d 92, 97, 239 P.3d 568 (2010) (citing *Faust v. Albertson*, 167 Wn.2d 531, 545-46, 222 P.3d 1208 (2009)). This standard of review is especially applicable to child witnesses because "[t]he competency of a youthful witness is not easily reflected in a written record, and [an appellate court] must rely on the trial judge who sees the witness, notices the witness's manner, and considers his or her capacity and intelligence." *State v. Woods*, 154 Wn.2d 613, 617, 114 P.3d 1174 (2005) (citing *State v. Przybylski*, 48 Wn. App. 661, 665, 739 P.2d 1203 (1987)). As our Supreme Court has noted, "'There is probably no area of law where it is more necessary to place great reliance on the trial court's judgment than in assessing the competency of a child witness.'" *Woods*, 154 Wn.2d at 617 (quoting *State v. Borland*, 57 Wn. App. 7, 11, 786 P.2d 810, *review denied*, 114 Wn.2d 1026 (1990)).

12

Furthermore, every person is presumed competent to testify, including children. *S.J.W,* 170 Wn.2d at 100. A child's competency is now determined by the trial judge within the framework of RCW 5.60.050, while the *Allen*[11] factors serve to inform the judge's determination. *S.J.W.,* 170 Wn.2d at 100. Accordingly, a party challenging the competency of a child witness has the burden of rebutting that presumption with evidence indicating that the child is of unsound mind, intoxicated at the time of his production for examination, incapable of receiving just impressions of the facts, or incapable of relating facts truly. RCW 5.60.050. Moreover, inconsistencies in a child's testimony do not necessarily call into question witness competency. *State v. Carlson,* 61 Wn. App. 865, 874, 812 P.2d 536 (1991), *review denied,* 120 Wn.2d 1022 (1993). Instead, such inconsistencies generally relate to the witness's credibility and the weight to give his or her testimony. *Carlson,* 61 Wn. App. at 874 (citing *State v. Stange,* 53 Wn. App. 638, 642, 769 P.2d 873, *review denied,* 113 Wn.2d 1007 (1989)).

## B. RELIABILITY OF S.L.'S STATEMENTS

Here, Hesselgrave contends that the court erred in finding S.L. competent to testify because the trial court did not properly consider the question of S.L.'s mental capacity at the time of the occurrence. We disagree with Hesselgrave.

---

[11] The *Allen* factors include
> (1) an understanding of the obligation to speak the truth on the witness stand; (2) the mental capacity at the time of the occurrence . . . to receive an accurate impression of [his testimony]; (3) a memory sufficient to retain an independent recollection of the occurrence; (4) the capacity to express in words his memory of the occurrence; and (5) the capacity to understand simple questions about [the occurrence].

70 Wn.2d at 692.

13

Hesselgrave relies on *In re Dependency of A.E.P.*, 135 Wn.2d 208, 223, 956 P.2d 297 (1998), for the proposition that a trial court cannot determine a child's mental capacity when there is no evidence establishing when the crime occurred. But *A.E.P.* is distinguishable. There, the court concluded that after reviewing the entire record there was nothing establishing the date *or time period* of the alleged sexual abuse. *A.E.P.*, 135 Wn.2d at 223.

But here, the record reveals that the alleged abuse happened either during the time S.L. lived with Hesselgrave, from December 2008 until September 2009, or during one night in the fall of 2010 when S.L. spent the night. Thus, the record does establish a general time period during which the alleged abuse occurred, that was sometime between late 2008 and the fall of 2010 when S.L. was either six, seven, or eight years old.

In considering the *Allen* factors, the trial court here said,

> She has to have the capacity at the time, which was some years ago, to receive accurate impressions of what was happening. I don't see any reason to doubt that. She may not have a great ability to express it, and some of her statements appear to be somewhat inconsistent with each other. That doesn't mean she couldn't understand what was happening to her. A six-year-old is old enough.

RP (Aug. 23, 2012) at 189. Accordingly, the trial court's written findings make clear that it considered whether S.L. was able to receive accurate impressions from the earlier of the two periods when she was six. And the court concluded that she could.

Furthermore, if a child can relate contemporaneous events, the court can infer the child is competent to testify about the abuse incidents as well. *A.E.P.*, 135 Wn.2d at 225. Here, S.L. was able to describe events from 2007. S.L. was also able to testify accurately regarding circumstances surrounding her time living with Hesselgrave in 2008 to 2009. Ling's testimony confirmed the

truth of these statements. Accordingly, substantial evidence supports the trial court's finding that S.L. could receive accurate impressions during the period in which the events allegedly occurred.

Again, relying on *A.E.P.*, Hesselgrave argues that there are serious questions regarding the potential impact of the therapy and interrogation S.L. underwent as the victim of a crime separate and distinct from the current allegation. The court in *A.E.P.* held that the third *Allen* factor, "'a memory sufficient to retain an independent recollection of the occurrence,'" may not be satisfied if the defendant can establish that a child's memory of events has been corrupted by improperly suggestive interviews. 135 Wn.2d at 230 (quoting *State v. Allen*, 70 Wn.2d 690, 692, 424 P.2d 1021 (1967)). Hesselgrave discusses the fact that Anna Watson, who conducted a forensic interview of S.L. after unrelated abuse came to light, used positive reinforcement techniques when S.L. made disclosures and did not question the truth of what S.L. said, instead "validating" the child's disclosures so that she would feel "good" if she made additional disclosures in the future.

But Hesselgrave advances no argument regarding how use of these techniques amounts to "improper interviews" nor does he suggest how participation in a forensic interview unrelated to her current disclosure would "taint" S.L.'s memory such that the aforementioned *Allen* factor is unsatisfied. Given the record of S.L.'s testimony and the deference we afford the trial court's determination of competence, there is sufficient evidence to support the finding that S.L. retained an independent recollection of the occurrence.

15

## C. CORROBORATION

Hesselgrave also argues that the trial court erred in admitting S.L.'s hearsay statements under RCW 9A.44.120 because there was insufficient corroboration to support those statements.[12] But the trial court did not err because S.L. was available to testify and in fact did testify at trial.

Corroboration of the hearsay statements is required only if the child is unavailable to testify at trial. *A.E.P.*, 135 Wn.2d at 226. And a child witness is considered "unavailable" under the purview of the statute if she is deemed incompetent to testify. *A.E.P.*, 135 Wn.2d at 227.

Here, the trial court properly found S.L. competent to testify and S.L. did testify. Accordingly, the trial court needed to find only that the time, content, and circumstances of S.L.'s statements provided sufficient indicia of reliability. The trial court considered the *Ryan* factors and entered findings determining that the statements were admissible. Thus, the trial court's rulings were not based on manifestly untenable grounds and the trial court did not abuse its

---

[12] RCW 9A.44.120 provides,

A statement made by a child when under the age of ten describing any act of sexual contact performed with or on the child by another, describing any attempted act of sexual contact with or on the child by another, or describing any act of physical abuse of the child by another that results in substantial bodily harm as defined by RCW 9A.04.110, not otherwise admissible by statute or court rule, is admissible in evidence in dependency proceedings under Title 13 RCW and criminal proceedings, including juvenile offense adjudications, in the courts of the state of Washington if:

(1) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability; and

(2) The child either:

(a) Testifies at the proceedings; or

(b) Is unavailable as a witness: PROVIDED, That when the child is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act.

discretion in finding that Hesselgrave failed to rebut the presumption of competence and in ruling

that S.L.'s hearsay statements were admissible under RCW 9A.44.120.

## III. PROSECUTORIAL MISCONDUCT

Hesselgrave asserts that his conviction must be reversed because the prosecutor's closing

argument suggested to the jury that acquittal of Hesselgrave was only possible by determining that

the State's witnesses were lying. We hold that the prosecutor's argument was not improper

because it did not suggest that the jury must disbelieve S.L. in order to acquit Hesselgrave.

### A. STANDARD OF REVIEW

To establish prosecutorial misconduct, Hesselgrave has the burden of establishing that the

challenged conduct was both improper and prejudicial. *State v. Cheatam*, 150 Wn.2d 626, 652,

81 P.3d 830 (2003). We review the prosecutor's conduct "by examining that conduct in the full

trial context, including the evidence presented, the 'context of the total argument, the issues in the

case, the evidence addressed in the argument and the instructions given to the jury.'" *State v.

Monday*, 171 Wn.2d 667, 675, 257 P.3d 551 (2011) (internal quotation marks omitted) (quoting

*State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)). When a defendant objects to alleged

misconduct at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice

that had a substantial likelihood of affecting the jury's verdict. *State v. Emery*, 174 Wn.2d 741,

760, 278 P.3d 653 (2012).

### B. FALSE CHOICE

In closing argument, over defendant's objection, the prosecutor told the jury that in the

State's view there were only three possibilities to determine the outcome of the case: (1) that

someone coached S.L., (2) that S.L. made it up on her own, or (3) that S.L. was telling the truth.[13] To prevail, Hesselgrave must show that the alleged misconduct had a substantial likelihood of affecting the jury's verdict. *Emery*, 174 Wn.2d at 760.

Here, Hesselgrave characterizes the State's argument as misconduct based on the presentation of a "false choice," which occurs when a party misstates the burden of proof, as well as the jury's role, by misleading the jury into thinking that acquittal requires the conclusion that the prosecution's witnesses are lying. Hesselgrave relies on *State v. Barrow*, 60 Wn. App. 869, 809 P.2d 209, *review denied*, 118 Wn.2d 1007 (1991), *State v. Miles*, 139 Wn. App. 879, 162 P.3d 1169 (2007), and *State v. Fleming*, 83 Wn. App. 209, 921 P.2d 1076 (1996), *review denied*, 131 Wn.2d 1018 (1997), in support of his argument.

But *Barrow*, *Miles*, and *Fleming* are readily distinguishable from Hesselgrave's case because in each of the cited instances, the prosecutor actually told the jury that they must disbelieve the State's witnesses in order to acquit the defendant and here, no such statement was made. *Miles*, 139 Wn. App. at 889-90; *Barrow*, 60 Wn. App. at 874-75; *Fleming*, 83 Wn. App. at 213.

Here, the prosecutor presented the jury with three "possibilities," but he did not tell the jury that it must agree with one of those possibilities in order to acquit Hesselgrave. Indeed, the prosecutor did not tell the jury that they *had* to find anything. Read in context, the prosecutor's statements were more a comment on S.L.'s credibility, which the prosecutor has wide latitude to do in closing argument. *State v. Stenson*, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997) (citing *State v. Hoffman*, 116 Wn.2d 51, 94-95, 804 P.2d 577 (1991)), *cert. denied*, 523 U.S. 1008 (1998). Some

---

[13] As a threshold matter, Hesselgrave objected after the prosecutor presented the "three possibilities" argument. Accordingly, Hesselgrave has preserved the issue for review.

of the prosecutor's "Power Point" slides to which Hesselgrave takes issue support this proposition. The State used a slide that read,

**No Evidence to Support
S.L. Made it up
on Her Own**

Ex. 24 at 8. Following this slide was one that read, "**One Conclusion** (3) S.L. is telling the truth." Ex. 24 at 8. This is not an argument that the jury must disbelieve S.L. to acquit Hesselgrave, but rather that the evidence shows that the jury *should* believe S.L. because her version of the events is credible. We hold that the prosecutor's argument was not improper.

## IV. COMMUNITY CUSTODY

Hesselgrave asserts that the sentencing court erred by imposing community custody condition numbers 13, 16, and 25 because these conditions are either unconstitutional or because the sentencing court was not statutorily authorized to impose them. We hold that the trial court was without authority to impose conditions 13, 16, and 25 as they currently read.

A defendant may argue for the first time on appeal that sentencing conditions placed on his community custody were imposed without authority under existing statutes. *State v. Jones*, 118 Wn. App. 199, 204, 76 P.3d 258 (2003). Whether to impose community custody conditions is within the discretion of the sentencing court and will be reversed only if manifestly unreasonable. *State v. Bahl*, 164 Wn.2d 739, 753, 193 P.3d 678 (2008). Imposition of an unconstitutional condition would be manifestly unreasonable. *Bahl*, 164 Wn.2d at 753. Similarly, a court abuses its discretion when it exceeds its sentencing authority. *State v. C.D.C.*, 145 Wn. App. 621, 625, 186 P.3d 1166 (2008). Furthermore, when a sentencing court imposes an unauthorized condition of community custody, appellate courts remedy the error by remanding the matter with instructions

to strike the unauthorized condition. *State v. O'Cain*, 144 Wn. App. 772, 775, 184 P.3d 1262 (2008).

The State concedes that we should remand to strike the phrase "'from a licensed physician'" contained in condition 13 because prescriptions can be lawfully issued by medical professionals other than licensed physicians. Br. of Resp't at 73. We accept the State's concession because RCW 9.94A.703(2)(c) only allows a court order to direct an offender to "[r]efrain from possessing or consuming controlled substances except pursuant to lawfully issued prescriptions" and does not include a requirement that the prescriber be a "licensed physician." Accordingly, the court exceeded its sentencing authority in imposing condition 13.

Hesselgrave also challenges condition 16 that provides,

Do not initiate, or have in any way, physical contact with children under the age of 18 for any reason, unless approved as per #14 above. Do not have any contact with physically or mentally vulnerable individuals.[14]

CP at 243. Hesselgrave contends that this condition was not statutorily authorized because his case involved no "physically or mentally vulnerable individuals." CP at 243. RCW 9.94A.703(3)(f) states that a court may order an offender to comply with any crime-related prohibitions. Additionally, the statute allows a court to order that an offender refrain from direct or indirect contact with the victim of the crime *or* a specified class of individuals. RCW 9.94A.703(3)(b). Our Supreme Court has concluded that when read in context, a provision prohibiting contact with a class of individuals also requires some relationship to the crime. *State*

---

[14] Condition 14 states that any contact with minor children would need to be supervised and would require prior approval by the sexual deviancy treatment provider and the community corrections officer.

*v. Riles*, 135 Wn.2d 326, 350, 957 P.2d 655 (1998), *overruled on other grounds by State v. Valencia*, 169 Wn.2d 782, 239 P.3d 1059 (2010). Notwithstanding Hesselgrave's argument, the sentencing court erred by imposing this condition for the reasons we describe below.

We recently analyzed an identical condition and held that the use of the term "vulnerable" fails to provide the safeguards against arbitrary enforcement required by due process. *State v. Johnson*, 180 Wn. App. 318, 327, 327 P.3d 704 (2014). We noted that, considering the definition of "vulnerable," the "breadth of [the condition] is startling."[15] *Johnson*, 180 Wn. App. at 328. We held that remand was required and ordered the trial court to either clarify the meaning of "vulnerable" or to strike that portion of the condition. *Johnson*, 180 Wn. App. at 329. Therefore, we remand for the trial court to clarify the term "vulnerable" or to strike condition 16.

Last, Hesselgrave takes issue with condition 25, which provides,

> Do not possess or peruse any sexually explicit materials in any medium. Your sexual deviancy treatment provider will define sexually explicit material. Do not patronize prostitutes or establishments that promote the commercialization of sex. Also, do not possess or use any cell phone that may provide access to the Internet as well.

CP at 244. Hesselgrave contends that the record does not support imposition of this condition because the case did not involve prostitution or "adult shops" and because the condition is unconstitutionally vague. Forbidding Hesselgrave from possessing sexually explicit materials was a crime-related prohibition because the record demonstrates that Hesselgrave showed S.L. sexually explicit material in print and video format and a sentencing court has broad discretion to impose reasonably crime-related conditions. *O'Cain*, 144 Wn. App. at 775.

---

[15] "Vulnerable" means "capable of being wounded: defenseless against injury" or "open to attack or damage: readily countered: inviting obvious retort, ridicule, or obloquy." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2567 (2002).

Similarly, the court did not err in imposing the provision prohibiting Hesselgrave from patronizing prostitutes. In Washington, it is a misdemeanor to patronize a prostitute. RCW 9A.88.110. Because trial courts are allowed to impose conditions requiring offenders to engage in law-abiding behavior, *Jones*, 118 Wn. App. at 205-06, and requiring that Hesselgrave not patronize prostitutes is consistent with law-abiding behavior, the trial court did not err by imposing these prohibitions contained within condition 25.

But regarding the prohibition against going to establishments that promote the "commercialization of sex" and the prohibition on the use of a cell phone that is capable of accessing the internet, these are prohibitions that are not reasonably crime related. There is no evidence to suggest that such establishments were in any way related to Hesselgrave's crime. Likewise, nothing in the record reveals that cellular phones were involved in Hesselgrave's crime. Moreover the court struck a separate condition that would have prohibited Hesselgrave from having internet access generally, unless it was otherwise approved. It is unreasonable to strike that condition but maintain the prohibition on the possession or use of a cellular phone which is capable of accessing the internet. The prohibition on possession of sexually-explicit material in any medium would also cover possession of such material obtained from the internet on a cell phone. Considering the ubiquity of "smart" cellular phones and the pace at which the technology develops, this provision essentially bars Hesselgrave from owning a cellular phone at any time in the future. We hold that the trial court abused its discretion in imposing conditions 13, 16, and 25. We order these conditions stricken or clarified on remand, consistent with this opinion.

No. 44177-2-II

Finding no other prejudicial error, we affirm the conviction and remand to correct the community custody conditions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, C.J.

We concur:

MELNICK, J.

HUNT, J.P.T.

23