IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 84854-2-I |
| Respondent, | |
| v. | DIVISION ONE |
| ALAN CARLTON MOORE, JR., | UNPUBLISHED OPINION |
| Appellant. | |

CHUNG, J. — A jury convicted Alan Moore, Jr. of three sex offenses stemming from sexual abuse of his six-year-old daughter, I.M. He challenges the trial court's denial of his CrR 8.3(b) motion to dismiss for the State's mismanagement of discovery. He also contends the court erred by finding I.M. competent to testify and admitting her hearsay statements. We conclude that the trial court's decisions were not an abuse of its discretion and affirm the convictions. However, we reverse and remand to strike the victim penalty assessment (VPA) and DNA fee from Moore's judgment and sentence.

FACTS

Alan Moore, Jr. and Sydney Williams began dating when they were in their late teens, and Williams became pregnant early in their relationship. The relationship ended soon after Williams gave birth in May 2014 to their daughter, I.M. Williams and I.M. lived with Moore for a short time, but then moved back to Louisiana to live with Williams's family.

In Louisiana, I.M. lived with her mother, her grandmother Kristine Traub,[1] her great-grandfather Nicholas Traub, her aunt, and her cousin. Because Williams has disabilities, her family assists her with caring for I.M. In May 2020, over her family's objections, Williams and six-year-old I.M. travelled to Washington to visit Moore.

Upon arriving in Washington, Williams and I.M. stayed with Moore at his apartment along with his girlfriend, Nicole Miller, and their newborn baby. During this time, I.M. told Williams, Moore, and Miller that her great-grandfather had sexually abused her. I.M. described specific acts of sexual abuse by Nicholas. While in Washington, I.M. also accused her cousin Caleb of sexually abusing her.[2] I.M. had made similar allegations about Caleb and Nicholas, as well as Williams's boyfriend Josh Vicknair,[3] prompting a Child Protective Services (CPS) investigation in Louisiana in 2019.

Moore made a CPS report and obtained a restraining order against Williams in Washington. Williams returned to Louisiana without I.M. at the end of July 2020. In November 2020, Williams obtained jurisdiction over I.M. in Louisiana and returned to Washington to retrieve her. Soon after returning to Louisiana, I.M. told Kristine that Moore had sexually abused her. Williams and Kristine took I.M. to Children's Hospital. I.M. reported vaginal pain, and a physical examination showed a rash, anal gaping, and a healing bruise on her right thigh.

---

[1] Due to the shared last name, we refer to Kristine and Nicholas by their first names. We intend no disrespect.

[2] Caleb is related to I.M. through Moore but lives in Louisiana. He was a child at the time of the allegations.

[3] Vicknair was the father of Williams's second child. He is deceased.

At that time, I.M. made further allegations of sexual abuse by Moore to her grandmother. The local sheriff's office was notified and came to the hospital to take a report from Williams. A child abuse pediatrician conducted an interview and examination of I.M. in December 2020. I.M.'s physical exam was "normal"— i.e., the pediatrician found no physical evidence of trauma or disease—but I.M.'s statements raised concerns that I.M. had been sexually assaulted. In February 2021, the State charged Moore with two counts of rape of a child in the first degree (domestic violence).

The case went to trial in September 2022. Prior to trial, the court conducted a lengthy hearing to assess I.M.'s competency and determine the admissibility of her hearsay statements to family members, an examining physician, and a child forensic interviewer. During that hearing, the State amended the information to add a count of first degree child molestation (domestic violence). Moore also moved for dismissal due to governmental mismanagement based on the State's failure to timely produce recordings requested in discovery. The court denied the motion to dismiss. The court found I.M. competent to testify and admitted her hearsay statements to Kristine, the examining physician, and the forensic interviewer. The court denied admission of statements I.M. made to Williams.

A jury convicted Moore on all counts and found Moore and I.M. to be members of the same family or household. The court sentenced Moore to an indeterminate sentence of 216 months to life. Moore appeals.

DISCUSSION

I.    CrR 8.3(b) Motion to Dismiss for Government Mismanagement

Moore argues the trial court erred by denying his motion to dismiss for governmental mismanagement based on the State's failure to timely produce discovery. Moore's claim fails because he cannot demonstrate prejudice from the State's delay.

Moore initially made a broad request for discovery in February 2021. In July 2021, Moore e-mailed the State requesting that it produce specific recordings. Moore had recorded telephone conversations with Williams, one of which allegedly included Williams's admission that I.M. fabricated the allegations against him. Moore provided the recordings to a CPS social worker who turned them over to law enforcement. Moore's counsel's July e-mail referenced and requested a copy of the recordings: "Detective Bittinger's report that starts on Bates 115 mentions on a few occasions a recording or recordings he collected a copy of from a DCYF case worker involving Sydney Williams stating the allegations against Mr. Moore Jr. were fabricated/false." The State acknowledged the request. Defense counsel reminded the State of the request for this specific discovery in September 2021, October 2021, and July 2022 but did not receive the recordings from the State. During this time, the State never provided an explanation for its failure to produce the recordings.

In a phone conversation after the July 2022 e-mail, which occurred in the context of preparations for the entry of an omnibus order, the State asked defense counsel if Moore was providing consent for Detective Bittinger to search

the USB in police possession for the requested recordings, listen to them, and provide a copy. Moore's attorney stated that he consented. The State followed up through e-mail on August 16, 2022, requesting e-mail confirmation of Moore's authorization to search, listen to the recordings, and copy the thumb drive, to which defense counsel responded with written authorization.

The court began the child hearsay hearing on September 7, 2022. On September 14, the State requested a hearing on a motion to exclude audio recordings to be held either September 21 or 22. Moore notified the State that he still had not received the recordings. On September 16, the State e-mailed a PDF attachment with a copy of Detective Bittinger's report about the recordings and delivered a copy of the recordings to Moore's counsel's office on Monday, September 19.[4] The next day, Moore filed a motion to dismiss pursuant to CrR 4.7, CrR 8.3(b), and the due process clauses of the state and federal constitutions. The trial court denied the motion to dismiss after finding neither mismanagement nor prejudice, stating, "[I]t's very hard for me to see how I could possibly say Mr. Moore is unlikely to get a fair trial because of the late revelation of this information. The prejudice is hard to see. And I am not able to find mismanagement."

Moore appeals the court's decision only based on CrR 8.3(b). CrR 8.3(b) allows the trial court to "dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial." The party

---

[4] The Snohomish County Public Defender Association received the audio files on September 19, but they were not uploaded to its internal filing system until September 22.

5

seeking dismissal bears the burden of showing both misconduct and actual prejudice. State v. Salgado-Mendoza, 189 Wn.2d 420, 427, 403 P.3d 45 (2017). The moving party must show misconduct by a preponderance of the evidence, but need not prove bad faith on the part of the prosecutor. Id. at 431. Governmental misconduct need not be willful; "simple mismanagement will suffice." Id. at 428.

CrR 8.3(b) allows the court to dismiss a criminal action if the State violates its discovery obligations. Salgado-Mendoza, 189 Wn.2d at 428. "Even if the State fails to live up to its discovery obligations, however, relief under CrRLJ 8.3(b) is available only if the trial court finds prejudicial governmental misconduct or arbitrary action." Id. at 428-29. Dismissal under CrR 8.3(b) is an extraordinary remedy. State v. Rohrich, 149 Wn.2d 647, 658, 71 P.3d 638 (2003). The misconduct must materially affect the defendant's right to a fair trial. Salgado-Mendoza, 189 Wn.2d at 429. While a defendant "may be impermissibly prejudiced if a late disclosure compels him to choose between his right to a speedy trial and his right to be represented by adequately prepared counsel," the party seeking relief must articulate how the misconduct prejudiced their defense. Salgado-Mendoza, 189 Wn.2d at 436. The party must show " 'not merely speculative prejudice but actual prejudice.' " Id. (quoting Rohrich, 149 Wn.2d at 649).

We review a trial court's ruling on a CrR 8.3(b) motion for abuse of discretion. State v. Blackwell, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993). "Discretion is abused when the trial court's decision is manifestly unreasonable,

or is exercised on untenable grounds, or for untenable reasons." Id. A discretionary decision is manifestly unreasonable or based on untenable grounds "if it results from applying the wrong legal standard or is unsupported by the record." Salgado-Mendoza, 189 Wn.2d at 427.

Moore fails to establish that the State's actions materially affected the defendant's right to a fair trial in order to demonstrate prejudice as needed to benefit from the extraordinary remedy of dismissal under CrR 8.3(b). Moore acknowledged he had previously obtained all the audio recordings, except for one, through other means. In the one audio recording he did not receive until September 22, Williams mentions that Kristine was going to kick her out of the house if she did not follow her wishes when speaking at court hearings about I.M. Williams stated did not feel that she and I.M. were safe in Louisiana and was concerned that Kristine would attempt to gain custody of I.M. Williams also admitted that she had told Moore that Nicholas had sexually abused her as a child.

In considering the motion to dismiss, the court noted, "Prejudice is a little bit unclear to me." The court explained,

> [T]here's no good reason to think that its late revelation will prevent Mr. Moore from getting a fair trial. I have every reason to think that this revelation, even late, will provide for a vigorous cross-examination of Ms. Williams. Not that it is significantly different in nature than the cross-examination that must have happened before or would have happened anyway given the information in general was already known. The fact that this information is more specific and more particular and the impeachment might very well feature the item being played for the benefit of the jury for purposes of assessing Ms. Williams' credibility . . . .

Moore was familiar with the statements made during the conversation at issue, as he was a participant and made the recording. Moore does not argue that the conversation revealed new facts requiring investigation. Rather, Moore contends that "[w]ithout this information, we had no reason to ask more directly and that would have made a substantial difference in how we conducted these interviews." But the defense had already pursued these avenues of investigation, asking the witnesses questions pertaining to Kristine's influence over Williams and I.M. and allegations that Nicholas had sexually assaulted Williams and I.M. As the court noted, these topics would have been used for cross-examination and impeachment even absent disclosure of the missing conversation. The audio recording, despite its untimely production, only provided greater detail for that impeachment.

Because the recording merely provided more detail for information already known to the defense, Moore cannot demonstrate that the late disclosure materially affected his right to a fair trial. Therefore, he fails to establish actual prejudice that would require dismissal under CrR 8.3(b). The trial court did not abuse its discretion in denying the motion to dismiss.[5]

## II. Child Competency to Testify

Moore argues the trial court erred in finding I.M. competent to testify because she did not understand the requirement to tell the truth, was not able to accurately reflect the past events, or was unable to form accurate memories of the events. The State contends the trial court did not abuse its discretion

---

[5] The State moved to strike news articles cited in Moore's reply brief on appeal. As we did not consider the articles as part of the factual record, we deny the motion to strike.

because I.M.'s testimony demonstrated that she knew the difference between the truth and a lie, had the capacity to receive accurate impressions of her stay in Washington, had memory of the events, and could express the memories in words. We agree with the State.

A child's competency to testify at trial is determined within the framework of the general competency statute, RCW 5.60.050. State v. C.J., 148 Wn.2d 672, 682, 63 P.3d 765 (2003). The bar for competency is low. State v. Brousseau, 172 Wn.2d 331, 347, 259 P.3d 209 (2011). Children are presumed competent until proven otherwise by a preponderance of the evidence. Id. at 341. The burden of proving incompetency is on the party challenging the child witness. State v. S.J.W., 170 Wn.2d 92, 102, 239 P.3d 568 (2010).

A young child is competent to testify if the child has:

> (1) an understanding of the obligation to speak the truth on the witness stand, (2) the mental capacity at the time of the occurrence to receive an accurate impression of the matter about which the witness is to testify, (3) a memory sufficient to retain an independent recollection of the occurrence, (4) the capacity to express in words the witness' memory of the occurrence, and (5) the capacity to understand simple questions about it.

C.J., 148 Wn.2d at 682. "The determination of competency rests primarily with the trial judge who sees the witness, notices his or her manner and demeanor, and considers his or her capacity and intelligence." Id. As a result, an appellate court must place great reliance on the trial court's judgment in assessing the competency of a child witness. State v. Woods, 154 Wn.2d 613, 617, 114 P.3d 1174 (2005). We review the trial court's determination of competency for abuse of discretion. Id.

9

In assessing the five factors, the trial court determined that I.M. demonstrated that she understood her obligation to tell the truth, was capable of receiving an accurate impression at the time of the incidents, had a memory sufficient to retain independent recollection of the events, had the capacity to express in words her memory of the occurrence, and had the capacity to understand questions. To challenge these findings, Moore points to I.M.'s inconsistent and conflicting accounts of her past allegations of sexual abuse and her clearly fabricated statements.

As to past allegations, I.M. initially denied that anyone else had ever touched her or that she had previously claimed that someone else had touched her, including Nicholas and Vicknair. She then corrected herself and said that "her brother Caleb" had touched her on her privates. Testimony from the hearing contradicted the statements regarding Nicholas and Vicknair. Miller testified that I.M. had made detailed allegations of sexual abuse by Nicholas. Williams testified that I.M. had told both her and Moore that Nicholas had sexually assaulted her. And a deputy from Snohomish County Sheriff department testified that I.M. told him about an incident with Vicknair. While these statements are clearly inconsistent with I.M.'s testimony that no one else had ever touched her, "an inconsistency in the child's testimony goes to the child's credibility and not to admissibility." Woods, 154 Wn.2d at 621. The contradictory statements could impeach I.M.'s testimony, but they do not undermine I.M.'s competency to testify.

In addition to inconsistencies, Moore highlights "complete fabrications" from I.M.'s prior interviews, including statements during her interview by defense

counsel that Miller was her "single aunt" and that I.M. lived in Washington for ten years, lived with her brothers, and on one occasion, jumped out of the window, flew onto the roof, then fell and bumped her head on a trampoline. I.M. also recounted that one time, while Moore was sexually assaulting her, Miller's six-year-old son, Jackson, interrupted them to use the bathroom. However, Miller did not have a son of that age or name. Miller's only son, a 12-year-old who lived in Portland, Oregon, with his father, had never visited the apartment or met I.M. No boys lived in the apartment in Washington. Additionally, I.M. was only six years old at the time, so could not have lived in Washington for ten years.

While these statements are fictitious, I.M. made them and most of the other clearly fabricated statements during prior interviews. The defense interview took place in October 2021, almost a year before the competency hearing. The test for child competency requires an understanding of the obligation to speak truthfully on the witness stand. See C.J., 148 Wn.2d at 682. During the hearing, I.M. demonstrated that she understood this obligation. She promised to tell the truth, explaining that "something that's true really has happened. A lie is something that never has happened." She was able to distinguish a lie when the State provided an example. And she reported that Williams told her that "if I do not tell the truth, I will get in very big trouble because I am not actually telling what's actually going on." She said her grandmother expected her to say "[e]verything that happened and not to lie." Moore notes that I.M. testified at that hearing that she had eaten a peanut butter and jelly sandwich for breakfast, but Kristine testified that I.M. had actually eaten eggs, bacon, a piece of toast, and

half of a brownie. However, other than this incorrect description of her breakfast, I.M.'s testimony at the hearing supports the trial court's conclusion that she understood her obligation to tell the truth.

The demonstrably false statements from the past do not impact I.M.'s understanding at the time of the hearing of the need to testify truthfully, but do raise questions as to the second factor in assessing competency, whether I.M. had the mental capacity to receive an accurate impression of the events as they were occurring. In addition to the fictitious brother, I.M. also told the defense investigator that Moore's apartment had 16 rooms, Williams and Moore shared a bedroom, Miller had her own bedroom, I.M. shared a bed with her newborn half-sister, and her brother slept on the floor. She also said that her mother moved to her own apartment where they had a dog for 16 days.

Despite these past statements, the trial court relied on information gathered from I.M.'s testimony at the hearing. The court noted that I.M. "recalls going to Washington to live with her dad. She recalled getting there via train," "[s]he clearly did remember some details about being in Washington, things that she liked to do in Washington, things that she didn't like in Washington." Indeed, I.M. relayed details from the train trip, talked about watching movies and playing dolls with her father, and being annoyed by the cats. Based on these statements, the trial court concluded that "there clearly is an understanding of her mental capacity at the time of the occurrence [as to] which she is to testify." I.M.'s demonstrated ability to remember events that happened around the time of the

incidents at issue supports competency.[6] Any examples of past fabrications could be used as impeachment but did not impact the court's baseline determination that she could form accurate memories at the time of the occurrences at issue.

Moore raises additional examples of inconsistencies and fabrications in I.M.'s past statements. However, those issues pertain to credibility rather than competency. I.M.'s testimony at the hearing demonstrated that she understood her obligation to be truthful, had formed independent memories of the occurrences, and could answer questions about them in her own words. The trial court did not abuse its discretion by finding I.M. competent to testify.

III.    Child Hearsay

Moore claims that the factors for admissibility of I.M.'s hearsay statements weighed against, rather than in favor of admission. The State argues the trial court did not abuse its discretion in allowing the hearsay testimony because the factors support admission. Again, we agree with the State.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. ER 801. Generally, hearsay evidence is not admissible unless subject to an exception under rule or statute. ER 802. RCW 9A.44.120(1)(a)(i) allows for admission of hearsay evidence "made by a child when under the age

---

[6] During oral argument, Moore cited to In re Dependency of A.E.P., 135 Wn.2d 208, 956 P.2d 297 (1998), in support of his claim that I.M. was incompetent to testify because she did not have the ability to receive accurate impression at the time of the alleged events. In A.E.P., the trial court "had not been told by anybody when the events were supposed to have occurred." 135 Wn.2d at 225. Without knowing the timeframe of the occurrence, the court could not properly assess whether the child had the capacity at the time of the event to receive an accurate impression and, therefore, abused its discretion by finding the child competent to testify. Id. at 225-26. Here, the timeframe is clear and I.M. testified to details of her visit and life in Washington. A.E.P. is inapposite.

of ten describing any act of sexual contact performed with or on the child by another."

When reviewing whether to admit hearsay evidence, the court must conduct a hearing outside the presence of the jury and find "that the time, content, and circumstances of the statement provide sufficient indicia of reliability." RCW 9A.44.120(1)(b). Admissibility of child hearsay statements does not require a showing of testimonial competency at the time of the out-of-court statements, including the ability to distinguish between truthful and false statements and an understanding of the obligation to tell the truth. C.J., 148 Wn.2d at 682-83. Rather, the inquiry focuses on whether the comments and circumstances surrounding the out-of-court statement indicate reliability. State v. Borboa, 157 Wn.2d 108, 120, 135 P.3d 469 (2006).

The Supreme Court has identified nine factors that courts should consider when assessing admissibility of child hearsay statements pursuant to RCW 9A.44.120, known as the Ryan[7] factors. Courts must consider

> (1) whether the child had an apparent motive to lie, (2) the child's general character, (3) whether more than one person heard the statements, (4) the spontaneity of the statements, (5) whether trustworthiness was suggested by the timing of the statement and the relationship between the child and the witness, (6) whether the statements contained express assertions of past fact, (7) whether the child's lack of knowledge could be established through cross-examination, (8) the remoteness of the possibility of the child's recollection being faulty, and (9) whether the surrounding circumstances suggested the child misrepresented the defendant's involvement.

---

[7] State v. Ryan, 103 Wn.2d 165, 175-76, 691 P.2d 197 (1984).

Woods, 154 Wn.2d at 623. These factors must be "substantially met," and not every factor must be satisfied. Id. We review a trial court's decision on admissibility of child hearsay statements for abuse of discretion. Id.

Here, the defense challenged the admissibility of several different statements made to Williams, Kristine, the examining physician, and the forensic interviewers. Kristine testified that during bath time right after returning to Louisiana, I.M. complained to her of pain in her bottom and showed Kristine that both her anus and vagina "were torn open" and said "[m]y daddy did this." According to Kristine, I.M. slowly revealed additional details and described various acts of sexual abuse by her father. Williams testified that Kristine initially informed her that I.M. had been sexually abused. A week or two after returning from Washington, I.M. began talking directly to Williams about the abuse, saying "daddy hurt me," and "daddy touched my private parts."

After I.M. made these disclosures, she was evaluated by a child abuse physician. The physician testified that I.M. gave "history of sexual abuse by her father." A copy of the audio recording of the interview was admitted during the hearsay hearing. In February 2021, a child forensic interviewer spoke with I.M. A video of this interview was also admitted for the hearsay hearing.

The trial court admitted the hearsay statements made to Kristine, the physician, and the forensic interviewer, but denied admission of Williams's hearsay testimony. During trial, Kristine testified about I.M.'s disclosure to her. The State also played the recordings of the interviews with the examining physician and forensic interviewer.

In assessing the Ryan factors, the trial court noted that not all of the factors weighed in favor of admissibility. Notably, the court explained that as to factor one, "[t]he motives of the adults around her are necessarily imparted onto the child because she is aware of what people want of her." The court elaborated, "[t]here's no question but that she at the age of eight understands that to say something about her [great-] grandfather now would disrupt the family that she's now in. So, factor number one militates against admissibility." For factor two, the court acknowledged that I.M. had made statements that were not true and, "in a given circumstance, this child will say something that isn't true. That is beyond dispute." Factor three, whether more than one person heard the statements, militated in favor of admissibility as "lots of people have heard these statements." Fourth, as to whether the statements were made spontaneously, the court noted this generally depends on "whether or not the statements followed leading questions," and that as to Kristine, the physician, and the forensic interviewer, the testimony indicated the statements were spontaneous, but it was less clear as to Williams.

Regarding the fifth factor, the timing of the statement and the relationship between the declarant and the witness, the close relationship with Kristine "militates in favor of admissibility," but did not "do[] much" with regard to Williams, who did not have as close of a relationship. Regarding the sixth factor, whether the statement was an assertion of past fact, the court stated, "I suppose it militates in favor of admissibility" but "it's a net zero." As to the seventh factor, whether cross-examination could show the declaration's lack of knowledge, the

court found it could, but because I.M. would testify and be subject to cross-examination, this factor did not "say a whole lot either way." Finally, as to factor eight, the court assessed whether or not I.M.'s recitation, rather than recall, is likely faulty, concluding "the possibility of a faulty recitation of events is far from remote," so this factor did not weigh in favor of admission of the hearsay statement.

Moore challenges the trial court's analysis of the ninth factor, "whether the surrounding circumstances suggested the child misrepresented the defendant's involvement," which the court described as "a big one." In assessing this factor, the court considered the timing of the events:

> [I.M.] was talking about something that she said her own father had done in Washington right after she came back from Washington, during a period of time when really the only people who could have had access to her were the defendant and his girlfriend, Nicole. And the other people that are -- who were subjects of former allegations, they would not have had access to [I.M.] any time in the recent past because, of course, she was in Washington. It is, of course, possible that they happened before she left Louisiana. But the circumstances, again, are that this disclosure came out right around the first opportunity that . . . [I.M.] would have had to confide in her grandmother. And so, these circumstances do more strongly support an inference that the declarant didn't misrepresent the defendant's involvement in her statements than that she did.

The trial court's analysis of this factor is logical. I.M. had been with her father, rather than any of the other potential abusers, for several months, including time without her mother around. Moore had the most recent access to I.M. And I.M. immediately confided the abuse to her grandmother when they were reunited. The timing suggests that I.M. did not misrepresent Moore as the abuser in her statements to Kristine.

Moore argues that the trial court should have analyzed the factor as whether I.M. had a motive to lie, citing State v. Leavitt, 111 Wn.2d 66, 75, 758 P.2d 982 (1988). However, Leavitt merely states, "defendant's claim that the child lied in order to be cared for by her mother is unpersuasive, and the circumstances are otherwise such that it is unlikely that the child misrepresented the defendant's involvement." 111 Wn.2d at 75. In this case, the trial court's analysis reflects this approach, focusing on whether I.M. had a reason to lie at the time she made the statement. The circumstances of I.M.'s statements, made immediately after returning home from spending months with her father, make it unlikely that she misrepresented Moore's involvement.

Moore's theory of the case relied directly on issues of credibility related to I.M., Williams, and Kristine. Therefore, the trial court properly placed great weight on factor eight in assessing admissibility of the hearsay statements. The timing and circumstances support that I.M. did not misrepresent Moore's involvement. Given the abuse of discretion standard, we conclude the trial court did not err by admitting the hearsay statements made to Kristine, the physician, and the forensic interviewer.

IV.   VPA and DNA Fee

The court imposed the required VPA and DNA fee but waived all other legal financial obligations. While this case was pending on appeal, the legislature enacted RCW 7.68.035(4), which prohibits the court from imposing the VPA "if the court finds that the defendant, at the time of sentencing, is indigent." The legislature also amended RCW 43.43.7541 to remove the language that made

18

the DNA fee mandatory. See LAWS OF 2023, ch. 449, §§ 1(4), 4; State v. Ellis, 27 Wn. App. 2d 1, 17, 530 P.3d 1048 (2023). Amendments to cost statutes apply prospectively to cases still pending on appeal. See State v. Wemhoff, 24 Wn. App. 2d 198, 202, 519 P.3d 297 (2022).

At sentencing, the court found Moore indigent. The State concedes the recent amendments require that these legal financial obligations be stricken. We agree and remand to strike the VPA and DNA fee from Moore's judgment and sentence.

CONCLUSION

The trial court did not abuse its discretion in denying Moore's CrR 8.3(b) motion because he failed to demonstrate the requisite prejudice necessary for the extraordinary remedy of dismissal. The court also did not abuse its discretion by finding I.M. competent to testify and admitting her hearsay statements. We affirm Moore's convictions for two counts of child rape in the first degree and child molestation in the first degree.

Affirmed, reversed and remanded to strike the VPA and DNA fees.

_Chung, J._

WE CONCUR:

_Birk, J._        _Mann, J._